In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 05-2433 & 05-2703

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES ROSS and DEREK WILSON,

*Defendants-Appellants.*

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 822—**Amy J. St. Eve**, *Judge.*

---

ARGUED FEBRUARY 9, 2007—DECIDED DECEMBER 14, 2007

---

Before BAUER, FLAUM, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* A jury convicted Charles Ross and Derek Wilson of robbing a postal truck docked at the Grand Crossing Post Office Annex in Chicago, Illinois ("Post Office"). Wilson had conspired to rob the Post Office on two earlier occasions, and he finally decided to put his words into action. Wilson, a postal employee, used his inside knowledge of the Post Office to facilitate the robbery and acted as getaway driver. Ross was the gunman during the robbery, and five months after the robbery, he was still in possession of small-caliber bullets. Ross also confessed his role in the offense to postal inspectors.

On appeal, Ross argues that his confession should have been suppressed as it was the product of coercion, that he was prejudiced by the joinder of his felon-in-possession of ammunition charge with counts related to the robbery, and contends that he should not have been tried with Wilson. We reject each of Ross's arguments, finding that his confession was voluntary and that he was not prejudiced by the joinder of the counts or of Wilson. Finally, Ross interjects a new argument on appeal: that events before trial should have prompted the court to request an evaluation of his competence. However, the district court had no reason to doubt Ross's capacity to consult with his attorney or to understand the charges against him.

Wilson's only claim on appeal is that the district court should not have admitted evidence of earlier conspiracies to rob the Post Office. Because the evidence was admissible under Federal Rule of Evidence 404(b), we affirm the judgment of the district court.

## I. BACKGROUND

On August 8, 2003, while two employees loaded the Post Office's daily remittances onto a postal truck, two men slipped into the space between the dock and the truck. As one man pointed a gun at the employee aboard the truck, the second employee fled. While the gunman kept his gun trained on the remaining employee, the other man boarded the truck and removed two bags of cash and checks from a sealed cage. The pair then joined their awaiting getaway car driver, making off with over $18,000 in cash and checks.

Fingerprints found at the scene matched those of Richard Johnston, and the driver of the postal truck identified Johnston in a physical line-up. After being

indicted for the robbery, Johnston admitted his role, identified the gunman as "Chuck," and described the apartment complex where "Chuck" lived. During the next four months, postal inspectors learned that "Chuck" was Charles Ross and obtained a warrant to search Ross's home.

Seven armed postal inspectors entered Ross's home early in the morning on January 12, 2004, to execute the search warrant. After knocking and announcing their presence, inspectors forced open Ross's door to find Ross, dressed in a tank top and boxer shorts, standing in his unlit apartment. As several inspectors secured Ross's residence, Postal Inspector John Donnelly pointed his MP5 submachine gun at Ross and told him to leave the apartment and lie face down in the hallway. Donnelly continued to point the submachine gun at Ross as he lay on the ground. After the apartment was secured, inspectors handcuffed Ross, helped him to his feet, and checked him for weapons. Relieved of the responsibility of guarding Ross, Donnelly entered the apartment and began searching Ross's bedroom. Inspectors Joselito Rocamora and Sylvia Carrier then escorted Ross into his living room, removed his handcuffs, gave him his *Miranda* warnings, allowed him to put on a pair of pants, and began questioning him about the robbery.

Although Ross initially denied involvement in the robbery, after ten to fifteen minutes of questioning, he confessed to committing the robbery with men named Ricky and Derek. Specifically, Ross admitted that he and his confederates had robbed two postal employees at the Grand Crossing Post Office of approximately $15,000 and that he had pointed an unloaded gun at the employees. Ross said he had since discarded the gun, and, when asked about fourteen .25-caliber and seventeen .22-caliber bullets discovered in the search of his bedroom, Ross claimed to have found them in a dumpster. At

some point during the five-hour interview, Ross asked to speak with someone about receiving a reduced sentence for cooperation. In response, inspectors permitted Ross to speak by phone with an Assistant United States Attorney and Ross agreed to cooperate in the inspectors' investigation.

The following day, while wearing a wire, Ross went to the Post Office to speak with Derek Wilson, Johnston's cousin and a Post Office employee, about the robbery. Ross told Wilson that police had been to his home asking about "Ricky," and that he was nervous and wanted to know why police had come to suspect him. Ross asked Wilson what had become of the post office bags, and Wilson responded that the bags had "disappeared" and could not have caused the police's suspicion. Wilson reassured Ross that he knew nothing, had heard nothing, and had not spoken to a soul. After suggesting that Ross speak to a mutual friend about the matter, Wilson ended the conversation because he thought it unwise to speak on post office grounds. Some time later, Wilson was arrested.

On December 14, 2004, the government returned a second superseding indictment against Ross and Wilson (having already pled guilty, Johnston was not named in the indictment). In Count One, Ross and Wilson were charged with conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371. Count Two charged them with robbing persons having custody of United States property under 18 U.S.C. § 2114(a). In Counts Three and Four, Ross was charged with knowingly possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A), and unlawful possession of ammunition by a convicted felon, a violation of 18 U.S.C. § 922(g)(1).

Before trial, Ross moved to suppress his confession as being coerced. After holding a suppression hearing at

which Ross, his son, his neighbor, and Inspectors Donnelly and Rocamora testified, the district court denied the motion to suppress, finding that Ross's account of coercion was not credible. Ross also moved to sever the felon-in-possession of ammunition count (Count Four) from the remaining counts of the indictment and to sever his case from Wilson's. These motions were also denied.

The government submitted a motion in limine requesting permission to introduce testimony regarding Wilson and Johnston's conspiracies to rob the Post Office in 1997 and 1998. The government argued that the prior conspiracies were intricately related to the charged offense and also admissible under Federal Rule of Evidence 404(b). The district court accepted both theories of admissibility and granted the motion.

Ross and Wilson were tried together, and Johnston was the key witness against both. Johnston testified that when he was unemployed in 1997, he asked Wilson's advice on making money. Wilson told him that the Post Office where he worked shipped large sums of money on a daily basis, that Friday was the best day to rob the Post Office, and that Johnston would need scissors to break into a cage where the money was stored. With Wilson acting as his getaway driver, in June 1997, Johnston stole more than $9,000 from the Post Office. The two tried again in May 1998, but were unsuccessful. On this occasion, Johnston had to board a postal truck and confront its driver to recover the money. Before Johnston could flee with the cash, the truck driver sprayed him with mace, and Johnston fled.

When Johnston expressed interest in robbing the Post Office in 2003, Wilson again offered inside information. Friday was still the best day to strike; the day's receipts were now stored in an annex across from the Post Office's main building; and two postal employees now transferred

the money to the postal truck. Since he would have to confront two employees in carrying out this robbery, Johnston decided to recruit a friend to assist. He asked Charles Ross, a recent acquaintance, to take part in the robbery and to be his getaway driver, and Ross agreed. Ross added that he would bring a gun. Because Ross's car was getting repaired on August 8, 2003, Wilson agreed to again act as the driver at Johnston's request. Johnston testified that he and Ross confronted two postal employees, that Ross pointed his gun at both gentlemen, and that Johnston cut the seal of a cage containing the bags of money and removed two mail bags. Johnston, Ross and Wilson then drove back to Ross's apartment where they split the money three ways. Johnston was arrested a few weeks later.

In addition, Inspector Rocamora testified about Ross's confession on the morning of the search. An agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives testified that the ammunition found in Ross's apartment had traveled in interstate commerce. The government introduced Wilson's post office personnel files and telephone and bank records. Ross stipulated to having a prior felony conviction and did not put on any evidence. Wilson called five witnesses to testify as to his whereabouts at the time of the robbery and his character.

The jury convicted Ross and Wilson on their respective counts, and both defendants moved for a judgment of acquittal or a new trial. Their requests were denied, and the district court sentenced Ross to 108 months' incarceration on Counts One, Two, and Four, and a consecutive eighty-four month sentence on Count Three. Wilson received one-hundred month concurrent sentences on his two counts. Both defendants now appeal.

## II.  ANALYSIS

### A.  The Admission of Ross's Confession Was Proper

Ross argues that his confession was coerced and should have been suppressed. In reviewing a district court's decision on a motion to suppress, we review factual findings for clear error and legal conclusions de novo. *United States v. Burks*, 490 F.3d 563, 565 (7th Cir. 2007). At the outset, Ross attacks the court's factual findings, arguing that the court clearly erred in crediting the postal inspectors' accounts. This is an uphill climb, because we give special deference to the district court, who heard testimony and observed witnesses, on factual matters. *See United States v. Johnson*, 383 F.3d 538, 542 (7th Cir. 2004). We will reverse only if "we are left with the definite and firm conviction that a mistake has been made", as when a court has credited "exceedingly improbable" testimony. *Burks*, 490 F.3d at 565. We begin by reviewing the testimony.

Inspector Donnelly was the first to testify at the suppression hearing. He testified that he performed two functions during the search of Ross's home. He carried an MP5 submachine gun and, once the apartment was secured, assisted in the search. According to Donnelly, approximately seven armed officers proceeded to Ross's door at about 6:20 a.m. on January 12, 2004. After knocking and announcing that they had a warrant to search Ross's home, the inspectors used a sledgehammer to gain entry into Ross's home. The door swung open revealing Ross standing inside the dark apartment in boxer shorts and a tank top. Donnelly said he then pointed the submachine gun at Ross and instructed him to exit the apartment and lie down on the hallway floor. Donnelly denied slamming Ross against the wall or even touching Ross during this encounter. After Ross complied with Donnelly's instructions, the other inspectors rushed into

the apartment to verify that no one else was inside. Donnelly says that during that brief interval he stayed outside with his gun pointed at Ross and always kept a distance of five feet from the suspect. Once the inspectors "cleared" the apartment, an inspector handcuffed Ross and performed a pat-down. Inspectors Rocamora and Carrier then escorted Ross to the living room and Donnelly proceeded to the bedroom to assist in the search. Inspectors found fourteen .25-caliber bullets and seventeen .22-caliber bullets in Ross's bedroom. Donnelly remembered seeing Ross again when he tossed a pair of Ross's pants out of the bedroom for Ross to wear. He thought that was "probably" the only other time he saw Ross in the apartment.

Inspector Rocamora, the supervising agent during the search, also testified at the hearing. Although Rocamora was excluded from the courtroom while Donnelly testified, the inspectors' testimony interlocked to a substantial degree. Rocamora testified that inspectors announced themselves at Ross's home at 6:25 or 6:30 a.m. After Ross exited the home, Rocamora said the apartment was checked for confederates and Ross was allowed back into the home. Rocamora stated that he removed Ross's handcuffs and read Ross his *Miranda* warnings before beginning the interview. Consistent with Donnelly's testimony, Rocamora testified that Ross was allowed to get dressed before the interview and that one of the inspectors showed Ross the search warrant. Rocamora recalled that Ross's interview began twenty-five to thirty minutes after entry into the apartment. According to Rocamora, Ross initially denied any involvement in the robbery, but within ten to fifteen minutes, he admitted to committing robbery with individuals named Ricky and Derek. Rocamora testified that no one placed a gun to Ross's head during the interview or even yelled or swore at him. Rocamora said Ross was given cigarettes, coffee, and chips

during the five-hour interview. At the close of the interview, Ross agreed to cooperate in the apprehension of the third conspirator by wearing a wire.

Ross told a very different story. According to Ross, the inspectors knocked at his door between 4:30 and 5:00 a.m., outside the time authorized in the warrant. He testified that one inspector snatched him out of the apartment, slammed him against the wall, and told him to get down on his knees and to shut up. At that point, an officer put a "rifle" to the back of his head. Ross said he repeatedly asked to see a search warrant, that the officers never showed him a warrant, and that the officers said "F it. We don't need it. Search it, anyway." Ross then said the inspectors asked him to sign a form giving consent to search and that he refused. As for the interview, Ross said he initially denied any involvement in the robbery, and only confessed when Inspector Donnelly came rushing from the bedroom saying "You're gonna stop—you're gonna stop—F"ing lying," and placed a gun to his head. Ross testified that Rocamora became upset with Donnelly and excluded him from the apartment. Even so, Ross said, he was so nervous that he confessed and later agreed to wear the wire only because he had already crossed the line into assisting the inspectors. The defendant called his son and a neighbor to testify at the suppression hearing. Both testified that the inspectors began the search before 5:00 a.m., but did not otherwise corroborate the defendant's account of events.

Ross says several purported discrepancies in the inspectors' testimony should have led the court to credit his testimony. For one, he notes that Donnelly testified that the inspectors began "conversing" with Ross ten minutes after breaking down Ross's door, but Rocamora testified the interview began twenty-five to thirty minutes after entry. This does not amount to a clear inconsistency because the inspectors may have conversed with Ross

before commencing a formal interview. To the extent there is an inconsistency, it can be attributed to the excitement of the circumstances and memory loss. And importantly, both inspectors agree as to what occurred during the moments leading up to the interview, even if they disagree on the precise timing of those events. Any discrepancy regarding the timing of the interview is minor and does not render the inspectors' testimony exceedingly improbable. *See United States v. Jensen*, 169 F.3d 1044, 1047 (7th Cir. 1999) (disagreement between two officers as to when a conversation occurred did not make their testimony exceedingly improbable); *United States v. Yusuff*, 96 F.3d 982, 986 (7th Cir. 1996) ("[M]inor inconsistencies in the police testimony do not undermine their credibility in any significant fashion.").

Ross exaggerates other alleged inconsistencies. For instance, he says Donnelly claimed that he did not remember who placed the handcuffs on Ross and that he did not recall seeing Ross anytime after tossing a pair of pants into the living room. Ross says these statements are exceedingly improbable because: (1) Donnelly was guarding Ross at close range at the time Ross was handcuffed, and (2) Donnelly had to have passed Ross to exit the apartment upon completion of the bedroom search. Ross's arguments are unconvincing because he misrepresents Donnelly's testimony. Donnelly testified that he was almost certain that Postal Inspector Zielke placed the handcuffs on Ross, and Donnelly testified that Ross "might have been" in the living room when Donnelly left the apartment.

Finally, Ross claims it is equally incredible that Donnelly never touched him and remained five feet away from him during the excited, fast-paced entry. But nothing about Donnelly's account is inherently unbelievable. Rather, it is Ross's version that strains imagination. During the course of four meetings with prosecutors

before trial, Ross never mentioned being threatened at gunpoint or coerced into confessing. We also think it unlikely that Ross was threatened into confessing on one day and contentedly cooperated with police on the next. The district court did not clearly err in accepting the inspectors' version of events.

So Ross is left to argue that the conditions of his interview, as recounted by Inspectors Donnelly and Rocamora, were coercive. He contends that the totality of the circumstances—the fact that there were six to seven armed postal inspectors in his apartment at the time of his confession and that he was "greeted" with a submachine gun minutes before the questioning began—renders his confession involuntary. We review the district court's conclusion on this question de novo. *Burks*, 490 F.3d at 565. "A confession is voluntary if, in the totality of the circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001) (internal quotation marks and citations omitted). Among the factors relevant in determining whether a confession was coerced are: the defendant's age, intelligence, education, mental state; whether he was given his Miranda rights; the duration and environment of the interrogation, including the suspect's access to the restroom and food during the interrogation; and the conduct of law enforcement. *Conner v. McBride*, 375 F.3d 643, 651 (7th Cir. 2004).

Based on the totality of the circumstances, we find that Ross's confession was voluntary. Ross was over fifty years old at the time of his interrogation and had significant experience with the criminal justice system because of his prior convictions. Although several armed inspectors were moving around his apartment at the time of his

confession, only two inspectors interviewed him at any
given time, and he was given his *Miranda* warn-
ings. Additionally, when Ross gave his confession, he
was sitting in his own apartment, fully clothed, and not
handcuffed, and he had been provided food and drink. The
entire interview lasted five hours but Ross's confession
came within ten to fifteen minutes after inspectors initi-
ated questioning; so he cannot argue he was worn down
before he confessed. This is not a circumstance where a
defendant contends his will was so overborne that he
confessed to a crime he did not commit. Indeed, at the
suppression hearing, Ross admitted his guilt. Except for
Ross's contention that Donnelly held a gun to his head,
which the district court found unbelievable, there is no
evidence of intimidation. The district court did not err
in admitting Ross's confession.

## B.  Ross Was Not Prejudiced By the Joinder of All
##     Counts

Ross contends that the felon-in-possession count (Count
Four) should not have been tried with the other counts
of the indictment. He argues that the joinder of counts
was improper under Rule 8(a) of the Federal Rules of
Criminal Procedure, and that, even if joinder was proper,
the court should have granted his Rule 14 motion to
sever to ensure a fair trial. On appeal, we review a claim
of misjoinder de novo,[1] and the denial of a motion to

---

[1]  A defendant need not renew a Rule 8 motion at the close of the
evidence to preserve the argument for appeal. *See United States
v. Terry*, 911 F.2d 272, 277 (9th Cir. 1990). "Because the propri-
ety of a Rule 8 joinder is determined solely by the initial allega-
tions of the indictment, there is no need to assess what actually

(continued...)

sever for an abuse of discretion. *See United States v. Warner*, 498 F.3d 666, 699, 700 (7th Cir. 2007).

We begin with Ross's argument that the counts were misjoined under Rule 8(a). Rule 8(a) permits the joinder of offenses that are: (1) of the same or similar character; (2) based on the same act or transaction; or (3) connected with or part of a common scheme or plan. Fed. R. Crim. P 8(a). The government contends the felon-in-possession count is of the "same or similar character" as the armed robbery and use of a firearm in a crime of violence counts because all three are "firearms offenses." We need not resolve this question, or even whether Rule 8(a) applies in this multi-defendant case,[2] because Ross could

_____

(...continued)
happened in the trial." *Id.*

[2]  We have previously said that "[w]hen two or more defendants are charged in a single indictment, Rule 8(b) governs joinder of defendants and offenses." *United States v. Cyprian*, 23 F.3d 1189, 1193 (7th Cir. 1994); *see United States v. Alvarez*, 860 F.2d 801, 823 (7th Cir. 1988); *United States v. Moya-Gomez*, 860 F.2d 706, 766 (7th Cir. 1988); *United States v. Velasquez*, 772 F.2d 1348, 1353 (7th Cir. 1985); *see also United States v. Carson*, 455 F.3d 336, 374 n.34 (D.C. Cir. 2006); *United States v. Irizarry*, 341 F.3d 273, 287 (3d Cir. 2003); *United States v. Jones*, 880 F.2d 55, 60-61 (8th Cir. 1989); *United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir. 1988); *United States v. Levine*, 546 F.2d 658, 661 (5th Cir. 1977); 24 Moore's Federal Practice § 608.03[2] (3d ed. 2007); 4 W. LaFave, J. Israel, & N. King, Criminal Procedure § 17.2(a) (1999); *cf. United States v. Lane*, 474 U.S. 438, 444-446 (1986) (evaluating claim that charges were misjoined in a multi-defendant trial under Rule 8(b)). However, we have not always applied that principle consistently, *see United States v. Lanas*, 324 F.3d 894, 899-900 (7th Cir. 2003) (analyzing joinder of offenses against in a multi-defendant trial under Rule 8(a)), and some courts have challenged the traditional view that in

(continued...)

never show prejudice. *See United States v. Lane*, 474 U.S. 438, 449 (1986) ("[W]e hold that an error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'").

The evidence of Ross's involvement in the robbery was simply overwhelming, so we are confident that the jury did not convict him on the robbery counts purely because of his status as a felon. Inspector Rocamora testified to Ross's confession. The jury heard Ross implicate himself during the tape recorded conversation with Wilson. In that conversation, Ross referred to himself, Wilson, and Johnston, acknowledging that the three were acquainted. He also asked Wilson what had been done with the post office bags, evidence of the robbery. Ross told Wilson that police had come to his home, he was scared, and wanted to know if Wilson had spoken to someone about their activities. Ross also commented on the fact that a lack of gloves had contributed to his problems (apparently referring to the fact that Johnston's fingerprints were found at the scene). In his efforts to ensnare Wilson, Ross all but admitted his own guilt on tape. Finally, the jury also heard Johnston testify in detail to Ross's involvement in the armed robbery. "In the face of overwhelming evidence of guilt shown here, we are satisfied that the claimed error was harmless." *Lane*, 474 U.S. at 450.

---

(...continued)

multi-defendant cases, Rule 8(b) governs the joinder of offenses. *See United States v. Frost*, 125 F.3d 346, 389 (6th Cir. 1997); *United States v. Southwest Bus Sales, Inc.*, 20 F.3d 1449, 1454 (8th Cir. 1994); *United States v. Eufrasio*, 935 F.2d 553, 570 n. 20 (3d Cir. 1991); *see also* 1A Charles Alan Wright, Fed. Practice & Procedure § 144 (3d ed. 1999).

Additionally, the court gave limiting instructions to minimize any risk of prejudice. *See United States v. Stokes*, 211 F.3d 1039, 1043 (7th Cir. 2000); *United States v. Coleman*, 22 F.3d 126, 135 (7th Cir. 1994). The jury was told to consider Ross's felon status only when resolving the felon-in-possession count and to give each count separate consideration, and we must presume the jury followed such instructions. *See United States v. Eberhart*, 434 F.3d 935, 939 (7th Cir. 2006). Given the abundant evidence of Ross's guilt and the court's limiting instructions, the joinder of all counts was not prejudicial.

Ross has waived his alternate argument that the court erred in denying his motion to sever by failing to renew the motion at the close of the evidence. *See United States v. Rollins*, 301 F.3d 511, 518 (7th Cir. 2002); *United States v. Caudill*, 915 F.2d 294, 298 (7th Cir. 1990); *United States v. Phillips*, 239 F.3d 829, 838 (7th Cir. 2001); *United States v. Brown*, 870 F.2d 1354, 1360 (7th Cir. 1989). Ross argues that defendants should only be obligated to renew motions to sever defendants, not motions to sever counts. He says that since joinder of counts is judged on the face of the indictment, *see Lanas*, 324 F.3d at 899, not on evidence adduced at trial, a defendant should not have to renew a motion to sever counts at the close of the evidence. We are not convinced. Although the initial question of joinder is assessed only on the indictment (and for this reason, we do not require parties to renew Rule 8 motions), a judge may consider trial evidence in ruling on a Rule 14 motion to sever. *See Coleman*, 22 F.3d at 134. For this reason, we have held that a motion to sever counts, like a motion to sever defendants, is waived if not renewed at the close of the evidence and we will not revisit that holding here. *See Rollins*, 301 F.3d at 518; *United States v. Berardi*, 675 F.2d 894, 899 n.10 (7th Cir. 1982); *United States v. Pacente*, 503 F.2d 543, 546 n.5 (7th Cir. 1974).

**C. Ross Was Not Prejudiced By Being Tried With Wilson**

Ross also contends that under Rule 8(b), he and Wilson should not have been joined for trial and that the court should have granted his Rule 14 motion for severance. These joinder and severance claims suffer from the same deficiencies as the others. There is overwhelming evidence of Ross's guilt so he cannot show prejudicial joinder. And by failing to renew his motion to sever defendants at the close of the evidence, he waived that claim and foreclosed our review.

**D. The District Court Did Not Err in Failing To Request an Evaluation of Ross's Competence**

Finally, Ross argues that the district court erred in failing to investigate his competence to stand trial. Only a competent person, one who "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and . . . a rational as well as factual understanding of the proceedings against him," may be subjected to trial. *Dusky v. United States*, 362 U.S. 402, 402 (1960); *see Woods v. McBride*, 430 F.3d 813, 817 (7th Cir. 2005). For that reason, "[a] defendant is entitled to a hearing on his competency if a *bona fide* doubt arises about his ability to consult with his attorney or his understanding of the charges brought against him." *Woods*, 430 F.3d at 817 (emphasis added). In fact, whenever circumstances call a defendant's competence into question, a court must initiate a sua sponte investigation into his mental condition. *Id.* Where, as here, the district court did not order a psychiatric examination or make a judicial determination regarding the defendant's competence, this court's review is "comprehensive." *United States v. Collins*, 949 F.2d 921, 924 (7th Cir. 1991).

Ross contends that his persistent complaints about the copies of the search warrant provided to him, his confused discussions regarding the warrant during status hearings, and his inability to cooperate with three lawyers created a *bona fide* doubt regarding his competence. Our review of the record suggests otherwise. The record reflects that Ross was obsessed with seeing the original search warrant; he complained that the copies of the search warrant presented to him did not "look right" and were unsigned or had illegible signatures; and he misunderstood the difference between a search warrant and an arrest warrant. Ross's concerns led to breakdowns in his relationships with defense counsel and may have informed his dismissal of two attorneys.

Even so, we do not think his complaints signaled a competence problem. That a defendant should repeatedly press losing arguments is neither unusual nor particularly alarming. Aside from highlighting Ross's stubborn insistence that the inspectors lacked a search warrant, counsel offers no basis to question Ross's competence. For instance, counsel does not identify a history of mental health concerns, hospitalizations, or use of medications. *See Balfour v. Haws*, 892 F.2d 556, 559-61 (7th Cir. 1989) (affirming a district court's finding that there was no *bona fide* doubt as to the defendant's competence although the defendant was taking anti-psychotic medication at trial and sentencing and had recently undergone inpatient and outpatient psychiatric treatment). Further, it is quite telling that not one of Ross's three trial attorneys suggested a competence problem; rather, they found him a difficult, but not incompetent, client. *Id.* at 561. The district court did not err in failing to request a psychiatric examination of Ross.

**E. The Evidence of Wilson and Johnston's Prior Conspiracies to Rob the Post Office Was Properly Admitted**

Wilson contends that the district court abused its discretion in allowing Johnston to testify regarding the 1997 and 1998 conspiracies to rob the Post Office. The district court found that the evidence was intricately related to the charged offense and admissible under Federal Rule of Evidence 404(b). We review that decision for an abuse of discretion, *see United States v. Holt*, 460 F.3d 934, 936 (7th Cir. 2006), and conclude that the evidence was admissible under Rule 404(b).

Rule 404(b) prohibits the admission of evidence of other wrongs or acts for the purpose of proving the defendant's character or that he acted in conformity with that character on a given occasion. *See United States v. Hurn*, 496 F.3d 784, 787 (7th Cir. 2007). However, evidence of a prior bad act may be admitted for other purposes, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. Fed. R. Evid. 404(b); *see Hurn*, 496 F.3d at 787. Evidence is properly admitted under Rule 404(b) if:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Dennis*, 497 F.3d 765, 768 (7th Cir. 2007) (citation omitted).

The testimony satisfies each of these elements. First, the evidence was directed at establishing at least one matter other than propensity, namely the defendant's intent. Because conspiracy is a specific intent crime, whether Wilson intended to conspire to rob the post office was automatically in issue. *See United States v. Curtis*, 280 F.3d 798, 802 (7th Cir. 2002); *United States v. Smith*, 995 F.2d 662, 672 (7th Cir. 1993); *United States v. Monzon*, 869 F.2d 338, 344 (7th Cir. 1989). Second, the prior conspiracies are also sufficiently similar to, and close in time with, the charged offenses. All of the robberies targeted the same post office, occurred on the same day of the week, required the use of scissors, and involved two of the same participants. Having occurred within five and six years of the charged robbery, the prior bad acts are not too remote in time. *See United States v. Polichemi*, 219 F.3d 698, 709 (7th Cir. 2000) (ten-year old bad acts evidence admissible under Rule 404(b)); *United States v. Kreiser*, 15 F.3d 635, 640 (7th Cir. 1994) (seven-year old bad acts). Additionally, the time gap is a bit misleading given that Johnston could not have participated in robberies during many of the intervening years as he was incarcerated. Third, the testimony of Johnston, a co-conspirator, was sufficient to support a jury finding that the defendant committed the prior acts. *See Curtis*, 280 F.3d at 802. Finally, although the evidence posed a risk of prejudice, its probative value in helping to establish an essential element of the conspiracy—intent—outweighed the risk of prejudice. The evidence was properly admitted under Rule 404(b); we need not consider whether it might also have been admitted under the intricately related evidence doctrine.[3]

---

[3] Wilson initially contended that he was improperly sentenced because the court imposed concurrent 100-month sentences on

(continued...)

### III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

A true Copy:

> Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

---

(...continued)

both counts though Count One carried a statutory maximum of five years. Because Wilson cannot show that the district court committed plain error, he has rightly withdrawn this argument. *See United States v. Gray*, 332 F.3d 491, 493 (7th Cir. 2003) ("no reversal is warranted under the plain error standard when the sentence imposed does not exceed the combined statutory maximum achievable by running the sentences consecutively").

USCA-02-C-0072—12-14-07