## In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 07-1573, 07-1574, 07-1575 & 07-1576

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRAD O. WILLIAMS, SEVILLE WILLIAMS,
CLINTON WILLIAMS, and RORY TUCKER,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Central District of Illinois.
No. 06 CR 20032—**Michael P. McCuskey**, *Chief Judge.*

ARGUED SEPTEMBER 5, 2008—DECIDED JANUARY 27, 2009

Before FLAUM, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* The four appellants in this case, Brad Williams, Seville Williams, Clinton Williams, and Rory Tucker, were charged with committing a series of armed robberies over a four month period. Four other individuals who were involved in the robberies pled guilty and testified against the defendants at trial.

All of the defendants were convicted and appeal their convictions.

Rory Tucker raises several challenges to his conviction and sentence. We reject his first argument regarding improper joinder of defendants because the indictment properly charged Tucker and the other defendants with conspiracy to rob banks, financial institutions, and a retail store. And because he failed to renew his motion at the close of the evidence, we also reject his argument that the district court improperly denied his motion to sever. Next, contrary to Tucker's assertion, we find that the government presented sufficient evidence to support the jury's verdict even though the government proved its case, in part, through the testimony of several co-conspirators. Finally, we reject his arguments that his sentence of 221 months' imprisonment was erroneous and unreasonable.

Because of the particularly violent nature of the robberies he committed, which justifies the district court's sentence of life imprisonment, we reject Brad Williams's challenge to his sentence. However, we vacate Clinton Williams's sentence because the record does not demonstrate that the district court considered his mental disability as a mitigating factor.

We dismiss the appeal of Seville Williams. As pointed out in his counsel's *Anders* brief, there are no nonfrivolous issues for appeal.

## I. BACKGROUND

According to the government's evidence at trial, Brad Williams committed a series of armed robberies from January 3, 2006 through April 24, 2006. He was accompanied and assisted by various people in these robberies, some of whom participated in more robberies than others. Tucker, for example, was involved only in the final robbery, though he also helped plan another robbery that was not executed.

Because Tucker is the only defendant challenging the sufficiency of the evidence against him, the details of every robbery are not necessary for this appeal. But for background, we provide a brief summary of the robberies and their participants.

On January 3, 2006, Brad Williams, Seville Williams, and two other masked men robbed a Walgreens store, striking the attending pharmacist on the head and leaving with money in a dark green bag. The robbery occurred around 2:30 a.m. and at 2:45 a.m., Brad Williams arrived at Nathein Franklin's apartment with Seville Williams and two other men. The four men were carrying a dark green bag and two revolvers. They changed in Franklin's bathroom and left the apartment.

On January 11, 2006, at approximately 5:40 p.m., Brad Williams and Seville Williams forced their way inside the Commonwealth Credit Union and held a gun to an employee's head while she unlocked the vault. They emptied the contents of the vault and fled in Clinton Williams's car.

On March 28, 2006, Brad Williams, Marion Jefferson, and Tyron Thomas robbed the Heights Finance store in Kankakee. Jefferson and Thomas, both wearing masks, entered the store with guns while Brad stayed in the car. Jefferson loaded a round into his gun and struck a male employee in the side of his head, causing the gun to discharge, when the employee told him there was no safe. Thomas grabbed another employee and took her to the front of the store, where she gave the men all of the money the store had—$235.

On April 7, 2006, Jefferson and Thomas entered the First Community Bank and Trust in Peotone, Illinois, wearing masks and waving guns while Brad Williams distracted the teller at the drive-through window. While Thomas brought three tellers into a back room, Jefferson pointed his gun at the assistant cashier and demanded that she put all the money from the safe into a bag he gave her. After Thomas made a phone call, Clinton Williams picked Thomas and Jefferson up outside the bank.[1]

In April 2006, Tucker conspired with Jefferson, Thomas, Collins, Brad Williams, Clinton Williams, Riley, and others to rob a bank in Chicago Heights but the robbery was aborted before anything happened because someone froze. A few days later, the men tried again in Rantoul, this time successfully and without the person who thwarted the prior attempt. Collins, Jefferson, Thomas,

---

[1] The Peotone robbery was not charged as a substantive count because of jurisdictional issues.

and Brad Williams entered the credit union first while Riley and Clinton Williams remained in cars outside. All of the men wore light blue ski masks. Tucker waited outside the credit union for most of the robbery and went in for less than 45 seconds at the very end. (The surveillance recording shows five robbers inside the bank at that time.) Tucker had a gun, as did Collins and Jefferson. As Tucker entered the building, he called out, "Let's go."

Police arrived on the scene and the robbers fled. Collins and Brad Williams were arrested after police pursuit. Clinton Williams was arrested in the driver's seat of one getaway car. Tucker jumped into the back seat of the other getaway car (which Riley was driving) but Riley was stopped and arrested. Tucker hid in the back seat for an hour until a crime scene investigator noticed him. Jefferson fled and hid for days until he was arrested. Thomas ran to a nearby carwash and jumped into a car, told the people in the car he had a gun, and directed them to drive out of the area. He was arrested the next day.

Only four of the eight defendants went to trial. Jefferson, Thomas, Collins, and Riley pled guilty and testified for the government. Tucker, Brad Williams, Clinton Williams, and Seville Williams were tried and found guilty. Tucker testified on his own behalf.

The district court sentenced Tucker to 221 months' imprisonment, Brad Williams to life imprisonment, Clinton Williams to 552 months' imprisonment, and Seville Williams to 546 months' imprisonment. All four defendants appealed.

## II. ANALYSIS

### A. Rory Tucker

#### 1. No improper joinder

Tucker maintains that because of his relatively minor role in the conspiracy, he should not have been tried together with his co-defendants. He argues that the joinder of the defendants was improper under Rule 8(b) of the Federal Rules of Criminal Procedure and that the district court improperly denied his motion to sever.

We review a claim of misjoinder de novo, focusing on the face of the indictment rather than the evidence adduced at trial. *United States v. Ross*, 510 F.3d 702, 710 (7th Cir. 2007). Federal Rule of Criminal Procedure 8(b) permits joinder of defendants if the defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." We have held that "Rule 8(b) is satisfied when the defendants are charged with crimes that well up out of the same series of such acts, but they need not be the same crimes." *United States v. Warner*, 498 F.3d 666, 699 (7th Cir. 2007) (internal quotation marks omitted). A conspiracy charge combined with substantive counts arising out of that conspiracy is a proper basis for joinder under Rule 8(b). *United States v. Stillo*, 57 F.3d 553, 557 (7th Cir. 1995).

The final indictment in this case contained ten counts. It charged all of the defendants, including Tucker, with conspiracy to commit armed robbery (Count 1). The conduct in Counts 2 through 10 relates to the charges in the conspiracy count. Although the government did not

charge Tucker with every one of those counts (Counts 2 through 10),[2] the indictment relates the charges against Tucker to the charges against the other defendants through the conspiracy charge. So the conspiracy charge is a proper basis for joinder because it sufficiently links the various robberies for Rule 8(b) purposes. *See, e.g.,* *Warner,* 498 F.3d at 699 (no improper joinder where conduct related to charges in the conspiracy count); *United States v. Dounias,* 777 F.2d 346, 348 (7th Cir. 1985).

Tucker relies on our decision in *United States v. Velasquez,* 772 F.2d 1348, 1352 (7th Cir. 1985) to argue that his robbery was not related to the other robberies committed by Brad Williams. In *Velasquez,* which was a cocaine trafficking case, we found misjoinder of one count because the indictment did not relate the charge in that count to any of the charges against the other defendants named in the indictment. The charge was against one defendant for heroin violations unrelated to the cocaine trafficking charges. *Velasquez* does not help Tucker. Unlike in that case, all of the conduct in Counts One through Ten relates to the charges in the conspiracy count, which was charged against both Brad Williams and Tucker.

Even if we found that misjoinder occurred, Tucker's argument fails because he cannot show actual prejudice. *See Ross*, 510 F.3d at 712; *Stillo,* 57 F.3d at 557 (misjoinder

---

[2]  Along with all of the defendants except for Seville Williams, Tucker was charged with armed bank robbery on April 24, 2006 (Count 8), and carrying a firearm during a crime of violence on April 24, 2006 (Count 9).

must result in actual prejudice). There was sufficient evidence to convict Tucker (more on this below) and the district court gave a limiting instruction both before the presentation of the evidence and again at closing arguments that the jury should consider the evidence regarding each defendant separately. Such instructions are normally sufficient to cure any possibility of prejudice. *Cf. Ross*, 510 F.3d at 711-12 (joinder of counts not prejudicial where there was "overwhelming evidence" of defendant's guilt and district court gave limiting instructions).

Tucker's argument regarding his motion to sever fails as well. We review the denial of a motion to sever for an abuse of discretion but we have held that "[a] motion for severance is typically waived if it is not renewed at the close of evidence, primarily because it is then that any prejudice which may have resulted from the joint trial would be ascertainable*.*" *United States v. Phillips*, 239 F.3d 829, 838 (7th Cir. 2001)*; Ross*, 510 F.3d at 710. Tucker filed a motion to sever pursuant to Federal Rule of Criminal Procedure 14 prior to the trial but he did not renew the motion at the close of trial, nor does he offer any reason for his failure to do so. Tucker is therefore precluded from now arguing that the court erred in denying his motion to sever.

### 2.  The government presented sufficient evidence to support the jury's verdict

Next, Tucker argues that the evidence against him was insufficient to convict him of conspiracy, armed bank robbery, and use of a firearm during an armed bank

robbery. Where the sufficiency of the evidence to support a conviction is challenged, "we review the evidence in the light most favorable to the verdict, and will reverse only if no rational trier of fact could have found him guilty of the charges beyond a reasonable doubt." *United States v. DeSilva*, 505 F.3d 711, 715 (7th Cir. 2007). We do not weigh the evidence or second-guess the jury's credibility determinations. *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001).

The evidence showed that Tucker helped plan the robbery of the Rantoul credit union, carried a gun with him into the credit union on April 24, 2006, and that he had planned and participated in an earlier botched robbery. He was found hiding in the backseat of one of the getaway cars outside the credit union. Tucker maintains that he had nothing to do with the robbery and the government's evidence was insufficient because none of the government's witnesses who placed him at the scene of the crime was credible. It is true that of the government's witnesses (friends and acquaintances of Brad, Clinton, and Seville Williams; officers; victims of the crimes and witnesses of the crime), the only people who testified regarding Tucker's role in the Rantoul robbery were his co-defendants Jefferson, Thomas, Collins and Riley. Tucker points out that these witnesses are all convicted felons with a history of lying, and he contends that their testimony was motivated by their own individual interest. But Tucker had the opportunity to, and actually did, cross-examine these witnesses, and the jury chose to believe them nonetheless.

Furthermore, Tucker testified on his own behalf and had the opportunity to convince the jury that his co-defendants were lying. Tucker testified that he was driving around Rantoul with Riley when Riley said he had to run to a friend's house. Riley parked the car in an alleyway and walked out of Tucker's view for six minutes. When Riley jogged back to the car, got in, and tried to drive away, police officers surrounded the car and pulled out guns. Tucker jumped into the backseat to avoid being shot and remained there because he did not know what was happening.

The jury, after hearing all of the evidence from both sides, found that Tucker participated in the armed robbery. On the evidence in this record, the jury was entitled to reach that conclusion, and we will not disturb the jury's determination on the basis of credibility issues in these circumstances. *Cf. United States v. Roberts*, 534 F.3d 560, 569 (7th Cir. 2008) ("[W]e reverse credibility determinations on appeal only under exceptional circumstances, such as where it was physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all.").

### 3.   Tucker's sentence

We turn to Tucker's sentence. Tucker was sentenced to 221 months' imprisonment, which was comprised of sixty months for Count One and 137 months for Count Eight (to be served concurrently with each other), and a mandatory eighty-four month sentence for Count Nine (to be

served consecutively to the terms of imprisonment for Counts One and Eight). The court's sentence for Counts One and Eight was at the top of the advisory guidelines range of 110 to 137 months, which was calculated using an offense level of 28 and a criminal history category of IV.

The probation officer who prepared Tucker's presentence investigation report ("PSR") used the November 2006 Sentencing Guidelines to calculate Tucker's offense level in the following manner. He began by grouping Counts One and Eight together pursuant to United States Sentencing Guideline (U.S.S.G.) § 3D1.2(b). The base offense level for robbery is 20. U.S.S.G. § 2B3.1. The probation officer added two points because the robbery involved taking the property of a financial institution, two points because two of the victims had suffered bodily injury, two points because the offense involved carjacking, and two points for obstruction of justice under U.S.S.G. § 3C1.1. This resulted in an offense level of 28.

Tucker objected to the PSR on several grounds. After hearing argument, the district court overruled Tucker's objections and determined the offense level to be 28. Tucker now challenges the district court's ruling on several of his objections. We find none of these challenges persuasive.

### a. Obstruction of justice enhancement not improper

Tucker maintains he should not have received an enhancement pursuant to U.S.S.G. § 3C1.1, which provides

for a two-level enhancement for the obstruction of justice. We review an obstruction of justice finding for clear error, giving deference to the district court's application of the guidelines to the facts. *United States v. Arceo*, 535 F.3d 679, 686-87 (7th Cir. 2008). A district court may impose the enhancement for perjury. U.S.S.G. § 3C1.1, cmt. 4(b). Perjury occurs "when a witness testifying under oath gives false testimony about a material matter with the willful intent to provide false testimony, instead of as a result of confusion, mistake, or faulty memory." *United States v. Price*, 516 F.3d 597, 607 (7th Cir. 2008) (citing *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). However, section 3C1.1 is not intended to punish a defendant for choosing to exercise his right to testify. *See* U.S.S.G. § 3C1.1, cmt. 2.

As discussed above, Tucker testified that he had nothing to do with the robbery on April 24, and that he had simply been driving around Rantoul with Riley that day. His explanation for his presence at the scene of the robbery was that he was waiting in the car for Riley in an alleyway. He thought Riley was visiting a friend and was surprised to see Riley "jog" up to the car followed by police. When the police drew their guns, Tucker jumped into the backseat and hid. When asked why he remained in the backseat of the car for almost an hour, Tucker explained that he was afraid and figured the police would search the car anyway.

The district court determined that Tucker committed perjury at trial because his testimony was incredible when contrasted with the government's evidence regard-

ing his role in the robbery. The court stated it was not simply finding that Tucker committed perjury based upon his denial of guilt, but that Tucker had willfully and intentionally attempted to obstruct justice by testifying untruthfully at trial. The district court relied on its observations of Tucker's demeanor and manner at trial, and compared Tucker's testimony to that of his co-defendants, the testimony from the other witnesses, and the footage from the surveillance cameras, to find that Tucker did not testify truthfully at trial.

Tucker argues that the application of the enhancement in these circumstances creates a "chilling effect" on a defendant's right to testify in his own defense. But we have already rejected the argument that the right to testify includes the right to lie on the stand. *See United States v. Jackson*, 300 F.3d 740, 749 (7th Cir. 2002) ("A defendant's right to testify does not include the right to commit perjury.") (quoting *Dunnigan*, 507 U.S. at 96); *United States v. Emerson*, 128 F.3d 557, 563 (7th Cir. 1997) ("§ 3C1.1 is not intended to punish a defendant for exercising his right to testify, but the guideline does punish those who commit perjury when denying their guilt."). The district court's conclusion that Tucker committed perjury on the stand is not clearly erroneous.

### b.   Carjacking enhancement not improper

Tucker also takes issue with the enhancement he received under U.S.S.G. § 2B3.1(b)(5), which provides for a two-level enhancement if a robbery involves carjacking. Although Tucker himself did not participate in the

carjacking, the guidelines provide that a defendant may be held responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Whether a co-conspirator's act was reasonably foreseeable is a factual finding we review for clear error. *United States v. Polichemi*, 201 F.3d 858, 866 (7th Cir. 2000).

Tucker conspired with six other men to rob the credit union in Rantoul. Although the plan involved two getaway cars (Clinton Williams and Riley served as the getaway drivers and stayed in the cars), the robbery did not go as planned because someone called the police. When the police arrived, all of the robbers fled and attempted to hide. Tucker himself hid in the backseat of one getaway car but Riley was not able to drive away. Tucker's co-conspirator Thomas ran to a nearby carwash, got into a car, and directed the occupants to drive him away. When the driver asked Thomas to get out, Thomas replied, "Don't make me pull out my mag." The district court found that Thomas's actions were reasonably foreseeable to Tucker.

There is no evidence that Tucker *knew* Thomas would commit the act of carjacking (indeed, the plan was to escape in getaway cars), so it is arguable that Thomas's actions were not foreseeable to him. But we have held in another robbery case that co-conspirators do not have to agree to specific conduct in order to be held liable (for U.S.S.G. § 1B1.3(a)(1)(B) purposes) for each other's conduct so long as the conduct was reasonably foreseeable in carrying out the robbery. *See United States v. Dorsey*, 209 F.3d 965, 967-68 (7th Cir. 2000) (co-conspirator's use

of firearms and physical restraint of a person committed during the course of a robbery was reasonably foreseeable to defendant who funded a robbery but did not participate in the robbery or know any details about its execution). In *United States v. Cover*, 199 F.3d 1270 (11th Cir. 2000), a case almost factually indistinguishable from this one, the Eleventh Circuit upheld a district court's finding that a carjacking by a co-conspirator was foreseeable to a defendant for the purpose of U.S.S.G. § 1B1.3(a)(1)(B) even if the plan was to escape in getaway cars.

The district court relied on *Cover* to find that it was reasonably foreseeable to Tucker that carjacking might occur, given that "a person who enters a bank robbery with firearms and other people intending to do whatever is necessary to effect that robbery" would "want to get away without being apprehended." While the district court's reasoning could have been more particularized, its determination that Tucker should have known a carjacking could occur is supported by the circumstances of the robbery. *Cf. United States v. Atwater*, 272 F.3d 511, 512 (7th Cir. 2001) (reversing application of enhancement where district court made no specific findings based on defendant's case and concluded that use of firearm in robbery was reasonably foreseeable solely because judge had "never heard of a bank robbery without a firearm"). Furthermore, in his one-paragraph argument, Tucker does not provide any authority demonstrating that this

determination is erroneous.[3]

### c.   Criminal history category not improperly calculated

Finally, Tucker argues that the district court erred in calculating his criminal history category. The district court added two criminal history points to Tucker's criminal history category pursuant to U.S.S.G. § 4A1.1(b), which provides a two-point increase for "each prior sentence of imprisonment of at least sixty days."

In 2005, Tucker pleaded guilty to battery in state court. He was sentenced to jail "with credit for time served from 9/8/04 to 2/3/05." The district court added two

---

[3] We also find no error in the district court's finding that Tucker possessed a firearm with a magazine that extended beyond the normal end of the magazine well. As an initial matter, we do not understand why this finding matters since it had no bearing on Tucker's base offense level or sentence. Because the jury convicted him of carrying a firearm during a crime of violence as charged in Count Nine, his possession or use of a firearm was excluded from the guidelines calculations for the robbery offense. To the extent that it matters, however, Tucker has not demonstrated that the district court's finding is clearly erroneous. The district court relied on the testimony of Marion Jefferson, whom the court found to be credible, and that credibility determination is entitled to great deference. *See United States v. Bennett*, 461 F.3d 910, 912 (7th Cir. 2006) ("The factual findings of the district court will not be overturned unless the reviewing court is left with the definite and firm conviction that a mistake has been made.").

points to Tucker's criminal history category based on this term of imprisonment, which was more than sixty days.

Tucker maintains that this calculation was improper because he was in jail as a result of his inability to post bond, and the plea in the battery case coincided with the time that he was held in custody due to his inability to post bond. Therefore, Tucker maintains that using the sentence for his battery conviction to increase his criminal history category penalizes him for his indigency because he was too poor to post bond. The state court judgment, however, clearly states that Tucker's sentence for the battery conviction was the time he spent in prison from September 2004 until February 2005. Tucker raises no constitutional challenge and there is no exception in the guidelines for a sentence of imprisonment that is based on credit for time served due to a defendant's inability to post bond. Therefore, the district court's application of the guidelines was not clearly erroneous.

### B.    Brad Williams

Brad Williams's sole argument on appeal is that his sentence was unreasonable. The district court sentenced him to a life sentence, which was at the top of his guidelines range of 1344 months to life.[4] He does not raise any objection to the calculation of his sentence, and we pre-

---

[4] We note that the mandatory minimum sentence he could have received was 984 months, or eighty-two years.

sume that a sentence within the properly calculated guidelines range is reasonable. *Rita v. United States*, 127 S. Ct. 2456, 2462-68 (2007); *United States v. Sachsenmaier*, 491 F.3d 680, 684 (7th Cir. 2007).

Brad Williams contends that his sentence was greater than necessary under 18 U.S.C. § 3553(a). In arriving at its sentence, the district court considered the letters from victims of the robberies, many of whom stated that they continue to suffer as a result of their experiences, and the court noted that there was nothing in Brad Williams's character and history that merited leniency. In the end, the district court concluded that "the only appropriate sentence, the only message to send to the other young Brad Williamses" was life. In light of the particularly violent nature of the robberies, the district court decided that a life sentence was appropriate to meet the goals expressed in 18 U.S.C. § 3553. That decision was not unreasonable.

### C.    Clinton Williams

Clinton Williams also challenges his sentence on appeal, and like Brad Williams, he does not raise any objection to the calculation of the sentence. Williams, who is thirty-six years old, has lived with his mother most of his life. He has an estimated IQ of 72, which suggests borderline mental retardation. *See, e.g., Mendez v. Barnhart*, 439 F.3d 360, 361 (7th Cir. 2006). And according to the PSR, Clinton Williams has been receiving disability benefits since the age of ten because he has been diagnosed with "autistic disorders and other pervasive developmental disorders."

As a teenager, he was institutionalized at Madden Hospital in Chicago, Illinois for two to three years. His youngest brother is Brad Williams.

At the sentencing hearing, Clinton Williams's attorney argued for a sentence on the low end of the guidelines range due to Clinton Williams's mental state. Counsel presented evidence that Clinton Williams operates at a reduced intellectual capacity and argued that he was mentally "slow," which caused him to be particularly susceptible to manipulation by his brother, Brad Williams. Counsel noted the minimal role Clinton played in the robberies, which was limited to serving as the getaway driver in three of the robberies. He never entered any of the banks or physically harmed any people inside, unlike his co-conspirators. Counsel argued that the combination of these circumstances not only presented a mitigating factor not accounted for in the guidelines, but also justified treating Clinton Williams differently from his co-conspirators.

The government did not contest the evidence of Clinton Williams's disability, conceding at the hearing that Clinton Williams had a "mental condition that is below normal" and that he "has had difficulty with that mental condition over the years." Furthermore, the government stated that there was no question that Brad Williams "manipulated" Clinton Williams to commit the crimes.

The district court addressed Clinton Williams's learning disability by relying on the report of Dr. Jason V. Dana, which the district court quoted at length. Dr. Dana was appointed by a magistrate judge to conduct an evaluation

of Clinton Williams while he was at the Metropolitan Correctional Center. Dr. Dana concluded that Clinton Williams had made "an intentional and concerted effort to minimize his functional ability and to present himself as more cognitively impaired than is truly the case." In other words, Dr. Dana thought Clinton was exaggerating his disability. The district court agreed and sentenced Clinton Williams to 552 months' imprisonment, which is at the top of the advisory guidelines range of 519 to 552 months.[5]

Section 3553(a) directs a district court to consider the history and characteristics of the defendant among the factors it weighs in determining a reasonable sentence. We have held that while a "district court may pass over in silence frivolous arguments for leniency," where a defendant presents an argument that is "not so weak as not to merit discussion," a court is required to explain its reason for rejecting that argument. *United States v. Schroeder*, 536 F.3d 746, 755 (7th Cir. 2008) (quoting *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005)).

There are two problems with the district court's analysis. First, the district court focused solely on Dr. Dana's conclusion that Clinton was attempting to make his disability seem worse than it truly was. But the court's

---

[5] The bulk of this sentence, as is the case with all the defendants in this case, is driven by the mandatory minimum sentences set forth by 18 U.S.C. § 924(c). In Clinton Williams's case, for example, 384 months of his sentence was based on section 924(c).

observation that Clinton Williams was exaggerating his mental and intellectual disabilities is not dispositive of whether he was mentally disabled or whether his *actual* disability justified a lower sentence. *See, e.g., Schroeder*, 536 F.3d 746, 756 ("The court was required to consider Schroeder's family circumstances argument and provide an adequate analysis of how much weight, if any, it should command."). All of the evidence in the record (including the government's own concessions) demonstrates that Clinton Williams did suffer from some form of mental disability. Indeed, Dr. Dana himself notes that Clinton had an "estimated" IQ of 72.[6]

Second, the district court did not take into account the combination of Clinton Williams's diminished capacity along with the fact that the ringleader was his brother, and the exacerbating effect that might have on his ability to think for himself. We remand Williams's case and on remand, the district court should consider his actual disability and the combination of his disability with his susceptibility to manipulation by his brother Brad.

### D.     Seville Williams

Finally, we address Seville Williams's appeal. Seville Williams's counsel moves to withdraw because counsel

---

[6] Dr. Dana's report is not in the appellate record so we do not know the basis for this estimate. We note that to the extent it is possible Clinton Williams has an even lower IQ, that might counsel in favor of a lower sentence.

discerns no nonfrivolous basis for appeal. *See Anders v. California*, 386 U.S. 738 (1967). Seville Williams opposes counsel's motion. We confine our review to the potential issues identified by Seville Williams and those identified in counsel's brief. *See United States v. Magers*, 535 F.3d 608, 609 (7th Cir. 2008).

Counsel considers whether the evidence was sufficient to identify Seville Williams as a participant in two of the robberies. Unlike the evidence against the other defendants, the government's evidence against Seville Williams was largely circumstantial evidence.

The government connected Seville Williams to the January 3 robbery through the testimony of Nathein Franklin. Franklin, who supplied Brad Williams with the code for the robbery of the Walgreens store, testified that he saw Seville with Brad immediately after the robbery. Seville, Brad, and two others went to Franklin's house after the robbery with a bag of money and changed out of their dark clothing.

As for the January 11 robbery, the government relied on the testimony of two inmates. Seville Williams was arrested on January 19. The inmates testified that Seville Williams had told each of them separately that he had robbed a currency exchange using a gun.[7] Both inmates

---

[7] In addition to the testimony of Derrick Grace, the government introduced a tape recorded conversation between Grace and Seville Williams. Seville argues that the introduction of this recording violated his constitutional rights. This is a

(continued...)

testified that Seville had described the robbery as involving a female employee, and one of the inmates testified that Seville told him the robbery occurred around closing time. Juamual De-Quin Pitt testified that Seville claimed to have robbed the place of around $300,000. These details matched up with the details of the January 11 robbery, which involved a female employee at a credit union who testified that one of the robbers held a gun to her head at closing time while she unlocked the vault and emptied it of $313,785 in cash.

The evidence against Seville Williams is weaker than the evidence against his co-conspirators. Nevertheless, as discussed above, sufficiency of the evidence challenges face a rigorous standard of review, and there was sufficient circumstantial evidence by which a jury could convict Seville. *See, e.g., United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000) ("[I]t is well established that a jury's verdict may rest solely upon circumstantial evidence.") (internal quotation marks omitted). There is no non-frivolous argument Seville Williams could make regarding the sufficiency of the evidence.

Counsel's remaining potential issues do not merit much discussion. The government presented sufficient evidence to support the jury's finding that Seville Williams was a member of the conspiracy. And we see

---

[7] (...continued) frivolous argument because Grace consented to wear a wire and record his conversation with Seville. *See United States v. Eschweiler*, 745 F.2d 435, 437 (7th Cir. 1984).

no reason to find his sentence unreasonable. The district court properly calculated the sentencing guidelines range and considered the section 3553(a) factors. Seville Williams did not object to the PSR. The district court, after considering the violent nature of the two robberies committed by Seville, sentenced him to 546 months' imprisonment, which is at the top of the advisory guidelines range. That decision was not unreasonable.

Accordingly, we grant Seville Williams's counsel's motion to withdraw and dismiss the appeal.

## III. CONCLUSION

The judgment of the district court is AFFIRMED as to Rory Tucker and Brad Williams. Clinton Williams's sentence is VACATED and his case is REMANDED for further proceedings consistent with this opinion. Seville Williams's counsel's motion to withdraw is GRANTED and his appeal is DISMISSED.