In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-2195

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SPENCER HARRIS,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 06 CR 30058—**Jeanne E. Scott**, *Judge.*

_____

ARGUED APRIL 8, 2008—DECIDED AUGUST 6, 2008

_____

Before KANNE, WILLIAMS, and TINDER, *Circuit Judges.*

KANNE, *Circuit Judge.* Spencer Harris was convicted after a jury trial on five separate criminal counts: one count of distributing crack cocaine, 21 U.S.C. §§ 841(a)(1), (b)(1)(B), one count of distributing powder cocaine, *id.* §§ 841(a)(1), (b)(1)(C), one count of possessing crack cocaine with intent to distribute, *id.* §§ 841(a)(1), (b)(1)(B), one count of being a felon in possession of a firearm, 18 U.S.C. §§ 922(g)(1), 924(c)(1)(B), and one count of possessing a firearm in furtherance of a drug-trafficking crime, *id.* § 924(c)(1)(A). The district court sentenced Harris to a total of 460 months' imprisonment. On appeal,

Harris claims that the district court made several erroneous evidentiary rulings, which deprived him of a fair trial. We do not believe that the district court abused its discretion in admitting the challenged evidence against Harris, so we affirm his conviction.

Because Harris's crimes involved crack cocaine, after oral argument we ordered the parties to file supplemental memoranda on the propriety of the district court's sentence in light of *Kimbrough v. United States*, 128 S. Ct. 558 (2007), and *United States v. Taylor*, 520 F.3d 746 (7th Cir. 2008). After considering the parties' responses, we do not believe that *Kimbrough* or *Taylor* invalidates Harris's sentence, so we affirm the sentence as well.

## I. HISTORY

On June 22, 2006, officers of the Springfield, Illinois, Police Department arrested David Haynes for possession of crack cocaine and marijuana that the officers recovered from a baby seat in Haynes's house during a parole check. After his arrest, Haynes agreed to cooperate with the police and to provide information about Spencer Harris, whom Haynes claimed sold him the crack cocaine. Haynes explained to the police that he could set up a drug purchase from Harris at any time, merely by telephoning him.

The Springfield police officers brought Haynes to meet with Drug Enforcement Administration (DEA) agents, who arranged for Haynes to participate in two controlled purchases of drugs from Harris. At the agents' direction, Haynes attempted to contact Harris on Harris's cell phone to schedule a meeting to purchase drugs. The

agents outfitted Haynes with audio and video re-
cording equipment, searched him to ensure that he was
not carrying contraband, and gave him money to pur-
chase cocaine—preferably crack cocaine—from Harris.

The first controlled purchase occurred on the day of
Haynes's arrest. Haynes first tried contacting Harris
using a DEA office telephone, to no avail. Haynes then
placed a second call to Harris from his personal cell
phone, and Harris's girlfriend answered. Haynes arranged
to meet Harris at the residence of Harris's girlfriend,
located at 1904 Greentree Street, in Springfield, Illinois.
There, Harris sold powder cocaine to Haynes and agreed
to convert the powder into crack cocaine while Haynes
waited; however, Harris could not find baking soda,
so Haynes left with the powder cocaine. Haynes then met
the DEA agents, who searched Haynes, recovered the
powder cocaine from him, and downloaded the audio
and video recordings onto a computer.

The second controlled purchase took place one week
later at Harris's home, located at 1844 South 14th Street,
also in Springfield, Illinois. Haynes again arranged the
meeting with Harris by cell phone, and DEA agents
met Haynes at a nearby golf course, where they sup-
plied him with recording equipment and a bicycle,
searched him for contraband, and provided him with
money. Haynes cycled to Harris's house and met Harris
in the backyard. Haynes purchased crack cocaine from
Harris, and then immediately returned to the golf course,
where the DEA agents recovered the crack cocaine and
downloaded the new audio and video recordings.

Law enforcement officers conducted surveillance of
both controlled purchases, and then obtained search
warrants for both residences. The officers executed the

warrants on July 6, 2006. At Harris's girlfriend's resid-ence, the officers found a .22 revolver locked in a dresser drawer, 9mm ammunition, powder cocaine, and crack cocaine. At Harris's residence, the officers discovered a loaded 9mm semi-automatic pistol in a bag on the kitchen table, powder cocaine, crack cocaine, digital scales, individual plastic bags, drug-cutting parapher-nalia, and $2,000 in cash. The officers arrested Harris. At the time of his arrest, Harris had a key to his own house, a key to his girlfriend's house, and a key to the locked dresser drawer from which the .22 revolver was recovered.

A federal grand jury issued an indictment that charged Harris with five counts: (1) knowingly and intentionally distributing five or more grams of a mixture or sub-stance containing cocaine base, *id.* §§ 841(a)(1), (b)(1)(B); (2) knowingly and intentionally possessing with intent to distribute, five or more grams of a substance containing cocaine base, 21 U.S.C. §§ 841(a)(1), (b)(1)(B); (3) being a felon in possession of a firearm, 18 U.S.C. §§ 922(g)(1), 924(c)(1)(B); (4) possessing a firearm in furtherance of a drug trafficking crime, *id*. § 924(c)(1)(A)(I); and (5) know-ingly and intentionally distributing a mixture or sub-stance containing cocaine, 21 U.S.C. §§ 841(a)(1), (b)(1)(C). Count 1 of the indictment was based on the crack cocaine sold to Haynes at the second controlled purchase. Counts 2, 3, and 4 were based on the crack cocaine and the 9mm pistol seized from the officers' execution of the search warrants. And Count 5 was based on the powder cocaine sold to Haynes at the first controlled purchase.

In anticipation of trial, the government gave notice of its intent to present evidence of other crimes, wrongs, or acts committed by Harris. *See* Fed. R. Evid. 404(b). The government's notice delineated the "other act" evidence

that it intended to offer: (1) Harris sold cocaine and crack cocaine to Haynes on numerous occasions prior to the controlled purchases; (2) during the same period, Harris transacted a number of drug deals with two other individuals, Troy Powers and Mario Brown; (3) Harris drove a number of luxury vehicles, including a black Lexus; and (4) in addition to the charged firearm, officers recovered the .22 revolver and 9mm ammunition during their searches. In response to the government's notice, Harris filed a motion *in limine*, which sought to bar the evidence of prior drug deals with Haynes, Powers, and Brown as irrelevant and as improper propensity evidence under Rule 404(b). Harris's motion also sought to keep out the evidence of the luxury vehicles and the recovered-but-uncharged revolver and ammunition as irrelevant and unfairly prejudicial.

The district court held a hearing on Harris's motion in early October 2006. With regard to the prior drug deals between Harris and Haynes, the district court stated that "those transactions . . . are relevant to show the history between the two. And in that sense they are intricately related to the charges found in . . . the indictment. So things that go to their history and relationship are very relevant and will not be barred." The district court explained that the evidence was also admissible under Rule 404(b) because it "would go to show the defendant's knowledge of cocaine, his intent to distribute it, and it would go towards establishing the nature and extent of the relationship between the defendant and [Haynes]." As for the drug transactions between Harris and Powers and between Harris and Brown, the district court explained that:

> [E]vidence of those should be limited to the same
> time frame that [Haynes] was purchasing crack or

> powder cocaine from [Harris]. For that time frame the other incidents are relevant as corroboration of [Haynes's] testimony, and to show that there was a source that Harris had for purchasing the cocaine that he in turn sold as cocaine or crack cocaine.

The district court also determined that the evidence that Harris drove luxury vehicles would "be relevant to show an unaccounted for source of income if the Government is able to introduce other evidence that the defendant lacked a source of income." The district court explained that the probative value of the vehicle evidence would not be outweighed by prejudice, "because there's nothing inherently illegal or improper about owning or driving a Lexus automobile." Finally, with respect to the .22 revolver and the ammunition, the court stated "[t]he second gun doesn't add much prejudice to the first gun, which is required under the Government's indictment, if it's going to prove its charge."

The day after the hearing, Harris pled not guilty to all five counts in the indictment, and the case proceeded to a jury trial. During the government's case-in-chief, the government introduced testimony from Haynes, Powers, Brown, Harris's girlfriend, and several DEA agents, as well as physical evidence and the audio and video recordings from the controlled purchases. The recordings portrayed Harris meeting with Haynes, the two men conversing about basketball shoes, and Harris counting money. The recordings did not show drugs being transferred, nor did they contain dialogue about the drug transactions.

In order to place its evidence of the controlled purchases into context, the government elicited testimony

about other drug deals between Haynes and Harris. But before Haynes could testify to his prior dealings with Harris, the district court gave a limiting instruction to the jury:

> Ladies and gentlemen, you're now hearing testimony about drug transactions other than those charged in the indictment. The ones charged in the indictment were in June of 2006. I want you to understand that this evidence of other drug transactions is admitted for the limited purpose of showing the defendant's knowledge of the drugs involved, his intent with respect to them, and the relationship and history between the defendant and this witness. You're to consider the evidence of these uncharged drug transactions only in those respects, and for those limited purposes.

After the district court's limiting instruction, and over the objection of Harris's counsel, Haynes explained that he was a drug dealer and that he was introduced to Harris in 2004 because he needed a new supplier of crack cocaine. Haynes stated that he purchased a quarter ounce of crack cocaine from Harris for $250 the first time they met, and Haynes recounted how he regularly purchased crack cocaine from Harris for $250 per quarter ounce whenever Haynes wanted after placing a quick call to Harris's cell phone. Haynes specified that he engaged in drug transactions with Harris about three or four times per week until Haynes went to prison in March 2005; once Haynes was released from prison in September 2005, he purchased about a quarter ounce of crack cocaine from Harris two or three times per day until his arrest. Haynes added that he also purchased a quarter ounce of crack cocaine from Harris for $250, without the knowledge of

the DEA, after the controlled purchases; the district court repeated its limiting instruction before Haynes testified about the subsequent drug deal.

Haynes testified that he had purchased drugs from Harris on other occasions at both residences where the controlled purchases occurred, and Haynes stated that Harris had converted powder cocaine to crack for him on other occasions. Haynes also testified that, on one occasion, he had seen the butt of a 9mm pistol sticking out of a couch in Harris's house. Haynes told the jury that when he asked Harris about the gun, Harris told him that he needed it for protection. Harris told Haynes that he was concerned because Brown had been arrested while driving away from Harris's house after a drug deal, and Harris was worried that Brown's family might come after him.

The government later called Powers and Brown as witnesses to testify about other drug deals involving Harris. Powers testified that he sold cocaine to Harris three or four times, beginning in 2005. Powers told the jury that when he and Harris met, they negotiated a purchase price by silently entering dollar amounts into a cell phone and passing the phone between them—the two rarely spoke and acceded to terms by nodding their heads. Brown testified that he purchased powder cocaine from Harris at Harris's residence on six occasions between the fall of 2004 and May 2005.

The government also introduced the other evidence it specified in its pre-trial notice of intent. Evidence that Harris drove luxury vehicles came in through several witnesses. Harris's girlfriend testified that Harris was not employed from 2003 until his arrest in 2006. Despite Harris's unemployment, Haynes saw him driving a Nissan

Pathfinder and a black Lexus, and Harris's girlfriend confirmed that Harris drove these vehicles, in addition to an Infinity sport-utility vehicle and a tan-colored vehicle. Harris's girlfriend testified that the Pathfinder was titled in her mother's name, two of the vehicles were titled in Harris's aunt's name, and the tan-colored vehicle was titled in Harris's six-year-old son's name.

The government introduced testimony about the second gun and ammunition through DEA witnesses, who testified that a .22 revolver and 9mm ammunition had been recovered from Harris's girlfriend's residence. A DEA expert witness explained that drug dealers often arm themselves to protect their person, drugs, and cash.

In his defense, Harris argued that Haynes had set him up in order to secure lenient treatment from the government in his own case. Harris bolstered this argument by highlighting that the recordings presented at trial did not show any drugs changing hands. Harris also argued that the evidence collected during the two searches did not belong to him. For example, Harris's counsel argued in closing that "[t]he .22 is found in [Harris's girlfriend's] house. It is in [her bedroom]. It is in [her] dresser . . . . It is [her] gun and she had it for her own protection." Harris's counsel suggested that the drugs found at Harris's girlfriend's house were part of her own "personal stash." Harris argued, in the alternative, that even if some of the drugs recovered during the police searches belonged to him, they were merely for his personal use and were not intended for distribution.

At Harris's request, the district court revised and expanded its limiting instruction prior to the jury's deliberations. The new instruction explained that the "evidence of other acts" was "not evidence that [Harris] committed

the acts alleged in the indictment at the times alleged." The court instructed the jury that such evidence should be considered "only on the question of motive, identity, or plan, or whether any acts of the defendant alleged in the indictment, if proven, were done with knowledge, intent, absence of mistake, or were not inadvertent acts." The instruction also reiterated that the government had the burden of proving the acts alleged in the indictment beyond a reasonable doubt. The jury deliberated and found Harris guilty on all five counts of the indictment.

A probation officer then prepared a presentence investigation report (PSR), in which the officer determined that Harris was a career offender, *see* U.S.S.G. § 4B1.1(a), because he had two prior qualifying felony convictions—an Illinois conviction for aggravated battery, and an Illinois conviction for manufacture or delivery of a controlled substance. The probation officer accordingly assigned Harris an offense level of 37 and a Criminal History Category of VI. *See id.* §§ 4B1.1(b), (c)(2); *see also* 21 U.S.C. § 841(b)(1)(B) (setting statutory maximum for distribution of controlled substance at life if defendant has prior final felony drug conviction). Based on these calculations, the PSR listed Harris's guideline imprisonment range as 420 months to life, *see* U.S.S.G. § 4B1.1(c)(2)(A), and the probation officer recommended a prison term of 420 months. Neither Harris nor the government objected to the PSR.

At the sentencing hearing, the government recommended that Harris receive a life sentence. Harris's counsel asked for a sentence between 300 and 360 months, arguing that a higher sentence would result in a *de facto* life sentence for Harris. The district court adopted the PSR without change, considered the arguments advanced by the parties, and canvassed several of the sentencing factors

enumerated in 18 U.S.C. § 3553(a). The court then sentenced Harris to 400 months' imprisonment on the distribution and possession-with-intent-to-distribute counts (Counts 1, 2, and 5), and to 120 month's imprisonment on the felon-in-possession count (Count 3), to run concurrently; the court also sentenced Harris to 60 months' imprisonment on the possession-of-a-firearm-in-relation-to-drug-trafficking count (Count 4), to run consecutively. This yielded a total sentence of 460 months' imprisonment, to which the court added eight years of supervised release and a $500 special assessment.

## II. ANALYSIS

Harris claims on appeal that he is entitled to a new trial because of the district court's evidentiary rulings. Harris argues that "[w]hether viewed individually or in their totality," these rulings denied him a fair trial. Specifically, Harris contests the admission of: (1) testimony about drug transactions with Haynes other than the controlled purchases; (2) testimony about the prior drug transactions with Powers and Brown; (3) testimony about the luxury vehicles; and (4) evidence of the uncharged .22 revolver and 9mm ammunition. Harris contends that the government's closing argument demonstrates why the evidence was erroneously admitted. In his supplemental memorandum, Harris asks that his sentence be reversed in light of *Kimbrough v. United States,* 128 S. Ct. 558 (2007).

### A. *The district court's evidentiary rulings*

We review the district court's evidentiary rulings for an abuse of discretion, *United States v. Owens*, 424 F.3d 649,

653 (7th Cir. 2005), including its decision to admit evidence of "other acts" under Federal Rule of Evidence 404(b), *United States v. Price*, 516 F.3d 597, 603 (7th Cir. 2008), and its decision to admit evidence under the "intricately related" doctrine, *United States v. Wantuch*, 525 F.3d 505, 517 (7th Cir. 2008).

1. *Testimony about other drug deals with Haynes*

The district court justified its admission of testimony about other drug transactions between Harris and Haynes because such testimony was "intricately related" to the conduct charged in the indictment, *see id.* at 517; *United States v. Strong*, 485 F.3d 985, 989-90 (7th Cir. 2007), and because the evidence was admissible under Federal Rule of Evidence 404(b). Harris contends that the district court improperly admitted the testimony because it was not intricately related to the charged conduct and because it was improper propensity evidence. *See* Fed. R. Evid. 404(b); *United States v. Simpson*, 479 F.3d 492, 496-97 (7th Cir. 2007).

Rule 404(b) prevents the admission of evidence of other crimes, wrongs, or acts to prove that a person acted in conformity with his prior conduct. Fed. R. Evid. 404(b). In other words, "Rule 404(b) plainly prohibits the government from introducing evidence of prior bad acts to show that the defendant's character is consistent with a propensity to commit the charged crime." *Simpson*, 479 F.3d at 497. But evidence may be properly admitted under Rule 404(b) for a non-propensity purpose, such as to prove " 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.' " *United States v. Sebolt*, 460 F.3d 910, 916 (7th Cir. 2006)

(quoting Fed. R. Evid. 404(b)). A district court properly admits evidence of prior acts under Rule 404(b) if:

> "(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."

*United States v. Moore*, No. 07-3445, slip op. at 6 (7th Cir. July 1, 2008) (quoting *United States v. Ross*, 510 F.3d 702, 713 (7th Cir. 2007)); *United States v. Dennis*, 497 F.3d 765, 768 (7th Cir. 2007) (quoting *Sebolt*, 460 F.3d at 916).

Acts that are "intricately related to" (or "inextricably intertwined with") a crime charged in the indictment "are generally admissible . . . and are not subject to the constraints of [Rule 404(b)]." *Strong*, 485 F.3d at 989-90; *see also United States v. James*, 464 F.3d 699, 709 (7th Cir. 2006); *United States v. Senffner*, 280 F.3d 755, 764 (7th Cir. 2002). But we recently noted that the " 'inextricably intertwined' formula . . . is unhelpfully vague." *United States v. Taylor*, 522 F.3d 731, 734 (7th Cir. 2008). We explained that "intent and absence of mistake are express exceptions to the Rule 404(b) bar; there is no need to spread the fog of 'inextricably intertwined' over them. Almost all evidence admissible under the 'inextricably interwoven' doctrine is admissible under one of the specific exceptions in Rule 404(b) . . . ." *Id*. at 735. After reviewing the record, we believe that there is "no need to spread the fog" of the "intricately related" doctrine in this case because Haynes's testimony about his other

drug transactions with Harris was admissible under Rule 404(b).

Haynes's testimony related to several non-propensity issues, including Harris's intent to distribute the drugs recovered during the police searches, his knowledge of the drugs, and the absence of mistake. Evidence that Harris sold drugs to Haynes was relevant to show that Harris intended to sell the drugs found during the police searches, and Harris's intent was automatically at issue because the indictment charged him with specific intent crimes. *See Ross*, 510 F.3d at 713 ("Because conspiracy is a specific intent crime, whether Wilson intended to conspire to rob the post office was automatically in issue."); *United States v. Puckett*, 405 F.3d 589, 596 (7th Cir. 2005) ("The crime of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), is a specific intent crime making the defendant's state of mind an element of the crime which is to be determined by the finder of fact."); *see also Moore*, No. 07-3445, slip op. at 6-7. In fact, Harris also placed his intent squarely at issue by claiming that he possessed the drugs merely for personal use. The evidence of other transactions directly rebutted Harris's asserted defense to the possession-with-intent-to-distribute charge by showing that Harris had engaged in drug deals in the past. *See Moore*, No. 07-3445, slip op. at 7-8; *Taylor*, 522 F.3d at 734; *United States v. Jones*, 455 F.3d 800, 808 (7th Cir. 2006); *Puckett*, 405 F.3d at 596. The testimony from Haynes also disproved Harris's contention that the drugs and the firearms seized during the searches of 1904 Greentree Street and 1844 South 14th Street belonged to his girlfriend and other tenants: the fact that Harris had engaged in other drug transactions proved that Harris

had knowledge of the drugs and firearms recovered. *See United States v. Best*, 250 F.3d 1084, 1092 (7th Cir. 2001).

The testimony from Haynes was also relevant to rebut the allegations of mistake that Harris raised by claiming that he was an innocent bystander and that Haynes "set him up." *See Moore*, No. 07-3445, slip op. at 7-8. Harris's counsel argued multiple times that Haynes provided evidence against Harris in an attempt to procure lenient treatment after officers discovered crack cocaine in a baby seat at Haynes's house. And Harris's counsel repeatedly noted that the audio and video recordings presented at trial lacked discussion about drugs—the recordings revealed a conversation between Harris and Haynes about basketball shoes, and showed Harris counting cash. By combining these points, Harris's counsel accused Haynes of fabricating evidence against Harris.

The government therefore needed to introduce evidence of the illicit history between Harris and Haynes in order to elucidate their ongoing business relationship and rebut Harris's attempt to downplay his role in the controlled purchases. *See Moore*, No. 07-3445, slip op. at 7-8; *Taylor*, 522 F.3d at 733 ("The buyers' previous knowledge about [the defendant] related to the accuracy (hence absence of mistake) of their testimony concerning the controlled buys that provided crucial evidence for the government's case."). The evidence of identical prior transactions related to the accuracy of the testimony concerning the controlled purchases by explaining how Haynes's relationship with Harris developed to the point that Haynes could easily purchase drugs from Harris after only a quick phone call. The prior transactions also helped explain why Harris did not answer the

initial telephone call placed from the DEA office phone (presumably a number unknown to Harris), but accepted the call placed from Haynes's personal cell phone. Similarly, the evidence of prior drug transactions at Harris's girlfriend's house tied Harris "to the house (where those items were found) and helped explain why he would possess the items." *Cf. Strong*, 485 F.3d at 990 (upholding admission of evidence under the "intricately related" doctrine).

The testimony from Haynes also satisfies the other prongs of our test for review under Rule 404(b). The testimony was "similar enough and close enough in time" to the charged conduct—in fact, the transactions were limited to a two-year period and involved identical amounts of the same drug as those charged in the indictment. *See Ross*, 510 F.3d at 713; *United States v. Ruiz*, 178 F.3d 877, 880-81 (7th Cir. 1999)*; United States v. Gibson*, 170 F.3d 673, 679 (7th Cir. 1999). The evidence was also sufficient to support a jury finding that Harris engaged in the prior drug transactions with Haynes: the evidence of the controlled purchases and the items recovered from the residences, as well as Powers's and Brown's testimonies, corroborated Haynes's coherent story. *See United States v. Mallett*, 496 F.3d 798, 802 (7th Cir. 2007).

And the evidence satisfies the final prong of our Rule 404(b) admissibility inquiry—the balancing test incorporated from Federal Rule of Evidence 403. *See Moore*, No. 07-3445, slip op. at 6 (quoting *Ross*, 510 F.3d at 713). Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of

cumulative evidence." Fed. R. Evid. 403. "[A]dmission of evidence under Rule 403 is entitled to special deference. 'Only in an extreme case are appellate judges competent to second-guess the judgment of the person on the spot, the trial judge.'" *Wantuch*, 525 F.3d at 518 (quoting *Strong*, 485 F.3d at 991); *see also United States v. Gardner*, 211 F.3d 1049, 1055 (7th Cir. 2000). "Evidence is unfairly prejudicial only if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *Wantuch*, 525 F.3d at 518.

We have already explained that the testimony about other drug transactions between Harris and Haynes had a great amount of probative value on the issues of intent, absence of mistake, and knowledge, especially in light of Harris's asserted defenses. *See Moore*, No. 07-3445, slip op. at 8. Contrary to Harris's suggestion, the district court did not allow the government to directly elicit testimony that Harris and Haynes had engaged in hundreds of drug transactions—Haynes testified to a pattern of prior drug transactions that occurred at regular intervals involving the same amounts of the same drug charged in the indictment. We do not believe that the protocol that Haynes described was inherently "emotional or incendiary." *See Strong*, 485 F.3d at 991. Still, the number of other drug transactions was not probative to explain the charged crime, and the government conceded at oral argument that testimony regarding the prior drug deals between Harris and Haynes could have been elicited in a way that prevented Haynes from stating that he purchased crack cocaine several times per week and then several times per day over lengthy periods of time. Standing alone, evidence regarding a vast num-

ber of similar drug deals might allow a jury to improp-
erly convict a defendant based on his propensity to sell
drugs. *See Simpson*, 479 F.3d at 499. But in this case,
Haynes's testimony did not stand alone. The district
court gave numerous and detailed limiting instructions
on the issue. These instructions alleviated any potential
prejudice caused by the testimony. *See United States
v. Hearn*, No. 07-1613, slip op. at 14 (7th Cir. July 18,
2008); *Moore*, No. 07-3445, slip op. at 9; *Wantuch*, 525 F.3d
at 518; *Mallett*, 496 F.3d at 802. Thus, the district court
did not abuse its discretion by admitting the evidence
of other drug transactions between Harris and Haynes.

2.   *Testimony about prior drug deals with Powers and Brown*

The district court also allowed the government to pre-
sent testimony under Federal Rule of Evidence 404(b)
about Harris's drug transactions with Powers and Brown.
Harris again argues that the district court abused its
discretion by admitting improper propensity evidence. *See*
Fed. R. Evid. 404(b); *Simpson*, 479 F.3d at 497. The govern-
ment counters that the evidence was properly admitted
because it was not introduced to demonstrate Harris's
propensity to sell drugs, but instead to prove his intent,
knowledge, opportunity, and the absence of mistake. *See*
Fed. R. Evid. 404(b); *Sebolt*, 460 F.3d at 916.

As with the other drug transactions between Harris
and Haynes, evidence that Harris sold drugs to Brown
was relevant to prove Harris's intent, *see Moore*, No.
07-3445, slip op. at 7-8; *Taylor*, 522 F.3d at 734; *Ross*, 510
F.3d at 713, and to prove his knowledge of the drugs
and firearms recovered, *see Best*, 250 F.3d at 1092. It also
helped establish Harris's motive to possess the gun. *See*

*United States v. Caldwell*, 423 F.3d 754, 759 (7th Cir. 2005); *United States v. Lloyd*, 71 F.3d 1256, 1264 (7th Cir. 1995). Haynes's testimony about his conversation with Harris about prior drug dealing with Brown revealed that Harris also needed the firearm for protection from Brown's family. The testimony from Powers and Brown was also relevant to rebut the allegations of mistake that Harris raised by repeatedly challenging the veracity of Haynes's testimony, and by frequently citing the fact that the recordings of the controlled purchases did not portray drugs changing hands or any discussion of drugs. *See Taylor*, 522 F.3d at 733. Powers's testimony about how he and Harris negotiated prices during their drug transactions by silently passing a cell phone between them corroborated and illuminated Haynes's testimony about the controlled purchases and was especially probative to prove absence of mistake. Moreover, as the district court noted, the evidence that Harris purchased drugs from Powers was admissible to establish that Harris had the opportunity to make the controlled sales by tracing a potential supplier of the drugs sold to Haynes.

The testimony from Powers and Brown was also "similar enough and close enough in time" to the charged conduct. Like Haynes, Powers and Brown also testified about drug deals involving cocaine within two years of the charged conduct. *See Ross*, 510 F.3d at 713; *Ruiz*, 178 F.3d at 880-81. The evidence was also sufficient to support a jury finding that Harris engaged in the prior drug transactions with Powers and Brown. *See Mallett*, 496 F.3d at 802. Finally, the substantial probative value of the testimony from Powers and Brown on the issues of intent, absence of mistake, knowledge, motive, and opportunity greatly outweighed any potential unfair prejudice, especially in light of the district court's time-frame

limitation and diligent, unopposed limiting instructions. *See Moore*, No. 07-3445, slip op. at 9; *Mallett*, 496 F.3d at 802; *United States v. Whitlow*, 381 F.3d 679, 686 (7th Cir. 2004). The district court did not abuse its discretion by admitting testimony about Powers's and Brown's drug transactions with Harris.

### 3.   *Testimony about Harris's luxury vehicles*

Harris claims that the district court improperly admitted evidence that he drove numerous luxury vehicles because the evidence was irrelevant and unfairly prejudicial. Under Federal Rule of Evidence 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Evidence of unexplained wealth, such as the testimony about Harris's luxury vehicles, is admissible as relevant circumstantial evidence of drug trafficking if the unexplained wealth was acquired contemporaneously with the alleged drug trafficking, if the wealth creates an inference that the defendant was involved in drug trafficking, and if the government presents evidence that the wealth was not obtained through legitimate means. *United States v. Carrera*, 259 F.3d 818, 829 (7th Cir. 2001); *see also United States v. Smith*, 308 F.3d 726, 737 (7th Cir. 2002) ("[E]vidence of an unexplained, lavish lifestyle is probative of the existence of income derived from a drug conspiracy."); *United States v. Penny*, 60 F.3d 1257, 1263 (7th Cir. 1995).

The district court articulated the proper legal standard in its ruling on Harris's motion *in limine*, stating that the

vehicle evidence would "be relevant to show an unaccounted for source of income if the Government is able to introduce other evidence that the defendant lacked a source of income." And the government laid its foundation through Harris's girlfriend, who testified that Harris was not employed from 2003 through 2006. The evidence of luxury vehicles had some probative value, especially considering that these vehicles were not registered to Harris but to his relatives and acquaintances—including his six-year-old son. We do not believe the vehicle evidence was unfairly prejudicial, and the district court did not abuse its discretion by allowing the government to present the evidence. *See Wantuch*, 525 F.3d at 518.

4. *Testimony about the uncharged .22 revolver and 9mm ammunition*

Harris also objects to the district court's admission of evidence regarding the .22 revolver and 9mm ammunition that officers recovered from his girlfriend's residence, but for which he was not charged. We can quickly dispose of this final evidentiary challenge because the evidence was admissible under Rule 404(b). *See Ross*, 510 F.3d at 713. The government was entitled to introduce evidence of the .22 revolver and the 9mm ammunition to rebut Harris's defense that the 9mm pistol found at his house was not his—the ammunition was particularly probative on this point. *See United States v. Tylkowski*, 9 F.3d 1255, 1262 (7th Cir. 1993) ("[T]he government was entitled to introduce the challenged weapons to rebut Richard's claim that [he] lacked the requisite knowledge of the contents of the sealed boxes."). And as with the testimony of other drug deals, the .22 revolver and the

9mm ammunition were also relevant to prove that Harris intended to distribute the drugs found during the searches. The evidence was found in the same search as the drugs and weapons that supported the charges in the indictment, and the evidence clearly supported a jury verdict on a felon-in-possession count. We agree with the district court that the addition of testimony about the second gun and ammunition did not add unfair prejudice, and the district court did not abuse its discretion in admitting the evidence. *Dennis*, 497 F.3d at 768.

## B.   *The government's closing argument*

Harris did not object to the government's closing argument at trial, so we review the prosecutor's comments for plain error. *See United States v. James*, 487 F.3d 518, 525 (7th Cir. 2007). Harris claims that the prosecutor's comments referring to Harris's prior dealings with Haynes, Powers, and Brown, as well as the prosecutor's characterization of the evidence, "demonstrate[ ] that the government used this evidence for different reasons than originally claimed; there is no mention here of intent or plan." We disagree. The prosecutor's closing argument fairly commented on the evidence to refute the closing argument by Harris's counsel, which repeatedly claimed that Harris did not have the requisite intent or knowledge to be convicted on any of the indicted charges. And the prosecutor explained to the jury that it could only consider the prior transactions for limited purposes, as instructed by the district court. The district court did not clearly err by allowing the prosecutor to comment on admissible evidence that rebutted the defense's trial theories. *See id.*

C. *The propriety of Harris's sentence after* Kimbrough *and*
   Taylor

Finally, we turn to Harris's sentence. At our request,
Harris submitted a supplemental memorandum on the
viability of his sentence after *Kimbrough v. United States*,
128 S. Ct. 558 (2007), and *United States v. Taylor*, 520
F.3d 746 (7th Cir. 2008), in which Harris argued that his
sentence was invalid. The government claims that Harris
waived any argument about the legitimacy of his sen-
tence by failing to raise it in his appellate briefs or at
oral argument. *See Valentine v. City of Chicago*, 452 F.3d 670,
680 n.1 (7th Cir. 2006); *Szczesny v. Ashcroft*, 358 F.3d 464,
465 (7th Cir. 2004). Initially objecting to a criminal sen-
tence in a post-argument supplemental memorandum
does seem like a waiver. *See Valentine*, 452 F.3d at 680 n.1.
Nevertheless, because the issue was raised subsequent
to oral argument at our request, and because this issue
will likely impact future cases, we will address it on the
merits.

In *Kimbrough*, the Supreme Court held that a district
court may reasonably depart under 18 U.S.C. § 3553(a)
from the 100-to-1 crack cocaine to powder cocaine ratio
prescribed by § 2D1.1 of the United States Sentencing
Guidelines. 128 S. Ct. at 575. In order to address "the
recurring issue of the proper treatment of crack sen-
tencing appeals that were pending when the Supreme
Court decided *Kimbrough*," in *United States v. Taylor* we
outlined a new approach for defendants who had failed to
object to a district court's pre-*Kimbrough* sentence under
the guidelines. *See* 520 F.3d at 746.

Although Harris was convicted for distributing crack
cocaine, this case presents a different issue entirely. Harris
was not sentenced under § 2D1.1 for the amount of crack

cocaine he distributed, but rather under § 4B1.1 as a career offender. Section 2D1.1 employs a drug-quantity table to provide an offense level that is based on the amount of drugs at issue. In contrast, § 4B1.1 correlates offense levels and sentencing ranges with the gravity of the crime by incorporating the statutory maximum sentence for the underlying offense. *See* U.S.S.G. § 4B1.1(B)(1)(A). For example, under § 4B1.1, a defendant is assigned an offense level of 37 if his crime carries a statutory maximum sentence of life. *See id.* Thus, § 4B1.1 does not inherently prescribe different punishments for crimes involving crack cocaine than it does for crimes involving powder cocaine. To the extent that a sentencing disparity might occur under § 4B1.1 based upon the type of cocaine involved, it does not result from the now-advisory drug quantity table, but is the product of a discrepancy created by *statute*. *See, e.g.*, 21 U.S.C. § 841(b) (setting the same statutory minima and maxima for 5 kg of powder cocaine and 50 g of crack cocaine).

While the sentencing guidelines may be only advisory for district judges, congressional legislation is not. As the First Circuit has explained, "the decision in *Kimbrough*—though doubtless important in some cases—is only of academic interest [in a case arising under the career offender guideline]." *United States v. Jimenez*, 512 F.3d 1, 9 (1st Cir. 2007); *see also United States v. Clay*, 524 F.3d 877, 878-79 (8th Cir. 2008) ("Although the recent amendments to the sentencing guidelines lowered the offense levels associated with crack in the drug quantity table in U.S.S.G. § 2D1.1, they did not change the career offender provision in § 4B1.1 . . . ."); *United States v. Crawford*, 520 F.3d 1072, 1075 (9th Cir. 2008). But our

discussion should not be read to suggest that § 4B1.1 is any less advisory for a district judge than the other sentencing guidelines. *Cf. United States v. Martin*, 520 F.3d 87, 96 (1st Cir. 2008) (upholding district court's decision to depart from career-offender guideline); *United States v. Sanchez*, 517 F.3d 651, 663 (2d Cir. 2008) ("[W]hile the sentencing statute expressly directs the district court to 'consider' the 'sentencing range established for . . . the applicable category of defendant as set forth in the guidelines' . . . it does not instruct the court to impose such a sentence." (quoting 18 U.S.C. § 3553(a)(4)(A))).

We follow our sister circuits and clarify: a sentence entered under the career offender guideline, § 4B1.1, raises no *Kimbrough* problem because to the extent it treats crack cocaine differently from powder cocaine, the disparity arises from a statute, not from the advisory guidelines. Therefore, the *Kimbrough* decision in no way affected Harris's sentence, so we will affirm the sentence given by the district court. *See United States v. White*, 519 F.3d 342, 349 (7th Cir. 2008).

## III. CONCLUSION

We AFFIRM the judgment of conviction, and the sentence of the district court.