**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted November 13, 2008[*]
Decided December 5, 2008

**Before**

RICHARD A. POSNER, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

Nos. 07-3874 & 07-3875

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* v. DERRIK HAGERMAN and WABASH ENVIRONMENTAL TECHNOLOGIES, LLC, *Defendants-Appellants.* | Appeals from the United States District Court for the Southern District of Indiana, Indianapolis Division. Nos. 1:06CR00139 David F. Hamilton, *Chief Judge.* |

**O R D E R**

A federal jury convicted Wabash Environmental Technologies (WET) and its president, Derrik Hagerman, on ten counts of making materially false statements in reports WET was obligated to file under the Clean Water Act. *See* 33 U.S.C. § 1319(c)(4). Hagerman was sentenced to a total of 60 months' imprisonment and, along with WET, was ordered to

---

[*] After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2).

pay $237,680 in restitution to the EPA to clean up the environmental mess they caused. WET and Hagerman now challenge an evidentiary ruling and a jury instruction and argue that the prosecution and the district court constructively amended the indictment. Hagerman further argues that his overall prison sentence is unreasonably long. We affirm.

WET operated a facility in Terre Haute, Indiana, that accepted industrial liquid waste, treated it, and discharged it into the Wabash River. The Indiana Department of Environmental Management issued WET a National Pollutant Discharge Elimination System permit, which allowed WET to release the treated wastewater into the river but limited the type and amount of pollutants the wastewater could contain. The permit required WET to periodically test samples of the expelled wastewater to ensure that the pollutants did not exceed permitted levels. It also required WET to provide the state with monthly reports—Monthly Monitoring Reports (MMRs) and Discharge Monitoring Reports (DMRs)—disclosing, among other things, the results of all tests and whether any tests had shown pollutant levels higher than the permit allowed. The permit mandated that WET use testing procedures approved by the EPA. Hagerman was responsible for completing the reports and certifying, as the permit directed, that the information he provided was "true, accurate and complete."

Hagerman and WET were indicted on 10 counts of violating the Clean Water Act by falsely certifying on MMRs and DMRs that the reported test results showing that the facility was in compliance with its permit limits were true and accurate. Each count corresponds to a separate report filed in 2004. For each count, the indictment identifies the allegedly false test results that Hagerman recorded on the report. All told, the indictment alleges that Hagerman and WET certified 32 reported test results, taken from January through October 2004, knowing that they were not true and accurate.

At trial, Lahn Neill and Barry Morrison, WET's lab technicians who were responsible for testing samples of the discharged wastewater for pollutants, testified about the procedures they used for analyzing the samples and recording the results in lab notebooks and on "bench sheets." Neill testified that after she and Morrison completed the bench sheets, she gave them to Hagerman. Copies of the bench sheets were entered into evidence and showed that, on the dates charged in the indictment, the levels of pollutants in WET's discharge wastewater exceeded permit levels. Hagerman, however, reported far lower levels on the company's MMRs and DMRs.

Neill also testified that in January 2004 she became worried that WET was not accurately reporting the levels of pollutants she found. She was also concerned that her records would go missing, so she began taking her lab notebooks and copies of her bench

sheets home each evening and making an additional backup of her data on electronic spreadsheets. These spreadsheets were admitted into evidence, over the defendants' objection.

Throughout 2004 Neill's tests showed alarmingly high levels of pollutants. When she would receive a particularly high result, she would bring the result to Hagerman, who accused her of performing her tests incorrectly. He told her that her "numbers" were too high and that he could not report them. He also told her that he had additional "information" that was not reflected in the testing results and so he ran her results through a "calculation" and concluded that the pollutant levels were within permit limits.

According to Neill, in October 2004 Hagerman confronted her at her home and demanded that she give him all of her documentation and erase her electronic files. The next day Neill gave Hagerman a box of documents but retained copies. She did not delete her computer files. Later that week, Hagerman mentioned to Neill that there had been a fire in a dumpster behind the facility. Neill later turned over all of her documentation to the government.

Morrison testified that in early 2004 he became concerned that the levels of pollutants he was seeing in his lab results were higher than WET's permit limits. In March he created several charts showing the levels of pollutants relative to the permit levels and gave copies of these charts to Hagerman. He received no response. In September 2004 he gave Hagerman a similar chart. The next month, one of his test results was so high that he wanted Hagerman to see it immediately. Because Hagerman had left for the day, Morrison taped a note containing the result to Hagerman's office door. He again received no response.

Morrison testified that the machine used to test for the presence of one pollutant—phenol—was not working from June until September 2004. During that time, Morrison, who was responsible for phenol testing, did not perform these tests and left blank the space on the bench sheets reserved for recording the phenol test results. WET replaced the machine in September 2004, but Morrison had trouble learning how to use the new machine to perform the EPA-approved test; thus, throughout the fall of 2004 Morrison used the machine to run a different test, which was not approved by the EPA, to "get quick results." He testified that Hagerman knew he was using a method that was not approved by the EPA.

An EPA agent testified that agency officials searched Hagerman's office pursuant to a search warrant. Agents found bench sheets for 2004, but the numbers on these bench sheets did not match the numbers on the copies of the bench sheets Neill had provided to

the government; they did, however, correspond to the results reported on the MMRs and DMRs. Agents also found copies of four electronic spreadsheets that were similar to those Neill kept to record her test results. They differed only in that Neill's version of the spreadsheets appeared to contain additional information.

Hagerman testified in his own defense. He acknowledged that he was responsible for completing the MMRs and DMRs and for certifying the accuracy of the test results he reported. He said that Neill and Morrison did not provide him with bench sheets and instead gave him their data on scraps of paper and post-it notes. Hagerman testified that he transferred this information onto bench sheets and threw out the scraps of paper. He said that Neill never reported test results showing any pollutants above WET's permit limits and denied reviewing the spreadsheets she created. He also testified that, when he received test results from Morrison showing elevated levels of pollutants, he would ask Morrison to explain how he performed the test. He would adjust the result to account for errors that he perceived in the testing process and for his knowledge about the kinds of waste WET's customers sent to the facility. He further testified that the lab notebooks, bench sheets, and spreadsheets showing test results inconsistent with those he reported on the MMRs and DMRs were fabricated by Neill and Morrison in an effort to frame him.

The jury found Hagerman and WET guilty on all 10 counts of submitting false MMRs and DMRs. At sentencing, Hagerman's attorney urged the district court not to impose a prison sentence. But the court rejected Hagerman's arguments and sentenced him to a total of 60 months' imprisonment, a term within the guidelines range. At the sentencing hearing, the court thoroughly discussed its reasons for choosing the 60-month sentence. The court memorialized the detailed rationale for its sentence in a published decision and concluded:

> The offenses here were not minor. They were cold-blooded, deliberate, and repeated decisions to profit from unlawful pollution and to cover-up the crime and obstruct justice, and Mr. Hagerman has shown no remorse at all. If this environmental case were not appropriate for significant criminal sanctions, it is hard to imagine one that would be.

*United States v. Hagerman*, 525 F. Supp. 2d 1058, 1067 (S.D. Ind. 2007).

On appeal Hagerman and WET first argue that the district court erred in admitting into evidence copies of the electronic spreadsheets that Neill created to record the results of her lab work. To the extent that the spreadsheets document tests which are not made subject to separate counts of the indictment but still conflict with what WET reported on its corresponding DMRs and MMRs, the defendants argue that they are evidence of prior bad

acts that should have been excluded under Federal Rule of Evidence 404(b).  Hagerman and WET also insist that the information on the spreadsheets relating to the charged counts make those spreadsheets cumulative of other evidence and thus they, too, should have been kept from the jury.  *See* FED. R. EVID. 403.   We review for abuse of discretion the district court's decision to admit this evidence.  *See United States v. Harris*, 536 F.3d 798, 807 (7th Cir. 2008).

Evidence of wrongdoing that is not part of the charged offense is inadmissible to establish a propensity to engage in crime.  *See* FED. R. EVID. 404(b); *Harris*, 536 F.3d at 807. But it is admissible to prove other material facts, including intent and knowledge, *United States v. Moore*, 531 F.3d 496, 499 (7th Cir. 2008), so long as the danger of unfair prejudice does not outweigh the probative value of the evidence, *Harris*, 536 F.3d at 807.

It is unclear to us how the spreadsheets could constitute evidence of inadmissible bad acts.  We have noted that when a defendant commits two criminal acts simultaneously but is charged only with one, "the evidence of the 'other' crime [cannot] be disentangled from the evidence of the charged crime." *United States v. Taylor*, 522 F.3d 731, 734 (7th Cir. 2008).  In such cases, the evidence essential to prove the charged crime "may unavoidably reveal" other criminal acts that are not charged.  *Id*.  That is precisely the situation that Hagerman and WET find themselves in here.  Hagerman and WET were charged with misrepresenting results of tests conducted between January and October 2004.  This was the same time period covered by the spreadsheets.  It would have been impossible for the prosecution to separate this evidence to eliminate any hint that the defendants also falsified other test results. *See, id.*; *see e.g.*, *United States v. Bass*, 794 F.2d 1305, 1312 (8th Cir. 1986).

What Hagerman knew when he completed the DMRs and MMRs was the central question at trial.  Hagerman denied receiving reports of test results in any format other than post-it notes and scraps of paper.  He also testified that he never saw the spreadsheets prepared by Neill and, indeed, had never received any test results from her showing unacceptable pollutant levels.  But the EPA found spreadsheets in Hagerman's office.  The spreadsheets offered through Neill were crucial in establishing that those found in Hagerman's office were in fact printouts of the spreadsheets created and maintained by Neill to record her lab results.  In showing that Hagerman possessed these printouts, the prosecution undercut Hagerman's defense that he never saw them.  More importantly, this link established that Hagerman knew that the lab technicians were consistently receiving results in excess of permit levels.  The evidence also debunked Hagerman's defense that he believed Neill and Morrison had fabricated evidence in a plot to frame him.   That copies of Neill's spreadsheets were found in Hagerman's office (in a folder labeled, in Hagerman's handwriting, with the title of the spreadsheets) bolstered Neill's testimony that they were

created contemporaneously with her lab tests and made it much less likely that she fabricated them after the fact.

Moreover, we reject Hagerman and WET's contention that the spreadsheets should have been excluded as cumulative of other evidence showing the lab technicians' test results. *Cf.* FED. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by. . . considerations of . . . needless presentation of cumulative evidence."). Only versions of Neill's spreadsheets—not the bench sheets she and Morrison prepared or her lab notebooks—were found in Hagerman's office. To the extent that Neill's spreadsheets contained information about the charged conduct, they were important to establish that Hagerman knew that the test results, as recorded by the lab technicians, differed from the results he reported on the MMRs and DMRs.

Finally, the probative value of the challenged spreadsheets was not offset by any danger of unfair prejudice. *See Harris*, 536 F.3d at 809. The probative value of this evidence in establishing Hagerman's knowledge was high, and was not outweighed by the prejudice to him. Hagerman does not even say how he was prejudiced; in his brief he asserts in a conclusory fashion that the prejudice was "obvious" and "significant." We cannot agree. There was ample evidence that Hagerman routinely reported pollutant levels on MMRs and DMRs that contradicted the actual lab results, and thus these spreadsheets could have done little to worsen the jury's view of his actions. If he was prejudiced, it was only because the spreadsheets found in his office underscored that he knowingly falsified the MMRs and DMRs.

Hagerman and WET next argue that the district court misstated the law in one of its jury instructions. The court instructed the jury that WET's permit required Hagerman to certify that each DMR and MMR he submitted was "true, accurate, and complete" and was prepared under his "direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted." At the urging of the prosecution and over the objection of the defendants, the judge further instructed the jury that "[t]he phrase 'properly gather and evaluate the information submitted' means that the information was gathered and evaluated in accordance with the terms and conditions" of WET's permit, including "the requirement that the analytical and sampling methods used conform to the applicable federal regulations." The court drew this language from the requirements made explicit in WET's discharge permit. Hagerman and WET argue that the provision of the Indiana Administrative Code setting out the specific language which holders of discharge permits must use in verifying MMRs and DMRs does not define the phrase "properly gather and evaluate the information submitted." *See* 327 IND. ADMIN. CODE 5-2-22(d). Thus, they insist, the judge should not have formulated a

definition and instead should have left it up to the jury to determine whether WET had a system in place to ensure that the results were properly gathered and evaluated.

We review a jury instruction de novo and will uphold it if it presents a fair and accurate summary of the law. *See United States v. Thornton*, 539 F.3d 741, 745 (7th Cir. 2008). Even an erroneous instruction, though, will not result in a reversal unless the instructions as a whole misled the jury in a way that prejudiced the defendant. *See United States v. Coté*, 504 F.3d 682, 687 (7th Cir. 2007). Hagerman and WET's view of the scope of the certification procedure is too narrow. It is the discharge permit that required WET to report its test results and certify their accuracy; thus, the district court was correct to look to the language of the permit to determine whether it provided guidance on the meaning of the certification language. WET's permit also dictated the test procedures. WET was compelled to use either the test methods approved in the EPA regulations, which are listed in the permit, or "different but equivalent methods" that have received approval from the EPA. We agree with the district court that, read together, this provision and the certification language from section 5-2-22(d)—which is quoted in the permit—required WET to certify that its test results were accurately calculated using the testing methods approved in the EPA regulations. *See United States v. Weitzenhoff*, 35 F.3d 1275, 1288 (9th Cir. 1993) (holding that construction of a National Pollutant Discharge Elimination System permit is a matter of law for the judge to determine); *see also Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, Md.*, 268 F.3d 255, 269 (4th Cir. 2001) (construing discharge permit using principles of contract interpretation).

This interpretation is further supported when understood in context of the statutory scheme of the Clean Water Act and the process for awarding National Pollutant Discharge Elimination System permits. The EPA grants discharge permits to those who wish to release pollutants into waterways, but also allows certain states, including Indiana, to issue such permits. *See* 33 U.S.C. § 1342(a), (b); 40 C.F.R. § 122.1; Ind. Dep't of Envtl. Mgmt., National Pollutant Discharge Elimination System Overview, http://www.in.gov/idem/4894.htm (last visited Oct. 15, 2008). The EPA regulations require all permit holders (including those who obtain their permits through state programs) to monitor pollutants "according to test procedures approved" by the EPA. *See* 40 C.F.R. §§ 122.41(4), 123.25(a)(12). Furthermore, the regulations specify the certification language permit-holders must use when they report their pollutant levels. *See* 40 C.F.R. §§ 122.22, 122.41(k)(1), 123.25(a)(5), (12). In line with the EPA's requirements, the Indiana statutes governing discharge permits contain virtually identical language regarding monitoring and certification requirements, *see* 327 IND. ADMIN. CODE 5-2-8(14), 5-2-13(d)(1), 5-2-22. This language is reprised again in WET's permit. Taken together, the EPA regulations, the Indiana statutes, and WET's discharge permit show that the EPA has established a comprehensive program to ensure that the levels of pollutants entering waterways are

carefully monitored, controlled, and disclosed.  This scheme would break down and the purposes of the Clean Water Act would be thwarted if each permit holder was allowed to create its own guidelines for the proper method of testing pollutant levels.  *See S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004) (noting that the purpose of the Clean Water Act is "'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters'"and that the system of discharge permits helps to achieve this goal by limiting the amount and variety of pollutants that can be released (quoting 33 U.S.C. § 1251)).  The district court was thus correct to instruct the jury that information is "properly" gathered and evaluated for purposes of a National Pollutant Discharge Elimination System permit only if gathered and evaluated in accordance with EPA regulations.

Our rejection of the defendants' evidentiary and instruction issues should foretell our view of their third and last challenge to their convictions.  According to Hagerman and WET, the government and the district court constructively amended the indictment and allowed them to be convicted for uncharged crimes by (1) introducing into evidence Neill's spreadsheets, which showed the results of all of her laboratory tests, (2) eliciting from Morrison that he  failed to run tests for a particular pollutant for several months while the necessary equipment was inoperable and used testing procedures not approved by the EPA; and (3) giving the disputed instruction to the jury.  All of this in combination, the defendants say, impermissibly led the jury to believe it could convict them of other uncharged instances of misrepresentation on DMRs and MMRs.  In particular, Hagerman and WET argue that the jury could have convicted them for uncharged crimes resulting from reporting test results while the necessary laboratory equipment was inoperable and no tests were performed.

All parties tell us that the standard of review is de novo, but Hagerman and WET did not specifically raise the constructive-amendment argument in the district court.  Thus our review is for plain error.  *See United States v. Khilchenko*, 324 F.3d 917, 920 (7th Cir. 2003); *United States v. Baker*, 227 F.3d 955, 963 (7th Cir. 2000).  An indictment has been constructively amended if the bases on which the jury may convict are expanded beyond those included in the indictment.  *See United States v. Blanchard*, 542 F.3d 1133, 1143 (7th Cir. 2008); *United States v. Mitov*, 460 F.3d 901, 906 (7th Cir. 2006).  Allowing conviction for an uncharged crime infringes a defendant's Fifth Amendment right to know the nature of the accusation and Sixth Amendment right to indictment by grand jury.  *See Stirone v. United States*, 361 U.S. 212, 215-16 (1960); *United States v. Ratliff-White*, 493 F.3d 812, 819 (7th Cir. 2007).   Constructive amendment can occur if the prosecution, during its argument or presentation of the evidence, or the court, through the jury instructions, expands the grounds the jury can rely on to convict the defendant.  *See Baker*, 227 F.3d at 960.

Introducing evidence that the defendant committed another crime should not be confused with constructive amendment of the indictment. Some evidence of uncharged criminal conduct is admissible, for instance, to prove the defendant's knowledge and intent. *See* FED. R. EVID. 404(b). If we were to accept Hagerman and WET's argument that the admission of evidence of other criminal conduct constructively amends the indictment, then any permissible use of evidence admissible under Federal Rule of Evidence 404(b) would result in a constructive amendment. This understanding of constructive amendment is much too broad. *See United States v. Rosario-Diaz*, 202 F.3d 54, 70-71 (1st Cir. 2000); *United States v. Leichtnam*, 948 F.2d 370, 379 (7th Cir. 1991).

In any event, we are convinced there was no constructive amendment here. The prosecution's evidence overwhelmingly established that Hagerman habitually failed to report the results of tests showing that WET was dumping more pollutants than its permit allowed and that he falsely reported that WET was in compliance with its permits even when no tests had been taken. But the prosecutor emphasized throughout the trial, and the court reiterated in the jury instructions, that the defendants were charged only with the 10 violations listed in the indictment. In both his opening statement and closing argument, the prosecutor referred specifically to the 10 charged counts and did not imply that the jury could convict the defendants for any other crimes. Furthermore, for each count, the prosecution provided the jury with a folder containing a summary and copies of the evidence supporting the allegations. The judge gave the jury a copy of the indictment, which includes a chart listing each charge and summarizing the evidence that supported it, and instructed the jury to consider each count separately. *See United States v. Cusimano*, 148 F.3d 824, 830-31 (7th Cir. 1998) (concluding that indictment was not constructively amended where judge gave jury copy of indictment and instructed that defendants were on trial only for charged offenses and that each charge must be considered separately); *see also United States v. Holley*. 23 F.3d 902, 912 (5th Cir. 1994) . Indeed, the jury returned a separate verdict on each of the 10 counts. Given the narrow focus on the 10 counts charged in the indictment, we perceive no reason to think that the jury could have convicted the defendants for any other crime and thus conclude that the indictment was not constructively amended.

Finally, Hagerman challenges his overall prison sentence, arguing that a 60-month total is unreasonable and that he should have received no prison time. This court reviews sentences for reasonableness, *see United States v. Campos*, 541 F.3d 735, 750 (7th Cir. 2008), and presumes that a sentence within the properly calculated guidelines range is reasonable, *see Rita v. United States*, 127 S. Ct. 2456, 2462 (2007); *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). To rebut this presumption, a defendant bears the burden of showing that the sentence imposed is unreasonable in light of the factors listed in 18 U.S.C. § 3553(a).

*United States v. Harvey*, 516 F.3d 553, 556 (7th Cir. 2008).  Hagerman has not come close to meeting that burden.

Hagerman argues that, for a whole host of reasons—including that the damage he caused to the environment could not be quantified, that in his life beyond WET he made "considerable" contributions to his community, that his family relies on him for support, and that imprisonment will make paying restitution difficult—he should serve no prison time.  But, the court explained at the sentencing hearing and in its published decision that these considerations did not outweigh the seriousness of Hagerman's crimes and the need for deterrence.  Although a sentencing court must consider the relevant factors under  18 U.S.C. § 3553(a) and the related arguments of the parties, it is not required to accept a defendant's assessment of how to weigh the information  *See United States v. Wachowiak*, 496 F.3d 744, 748 (7th Cir. 2007); *United States v. Filipiak*, 466 F.3d 582, 583 (7th Cir. 2006).  And we will not reverse a sentence just because a defendant disagrees with the district court's assessment of the relevant factors.  *See United States v. Laufle*, 433 F.3d 981, 988 (7th Cir. 2006).  The district court carefully considered all of Hagerman's nonfrivolous arguments and weighed them against the gravity of his offense, the need for deterrence, and the other factors under § 3553(a).  *See United States v. Gammicchia*, 498 F.3d 467, 469 (7th Cir. 2007).  The court did not give Hagerman's arguments the weight that he urged, but his disagreement with the court's assessment does not demonstrate that the court failed to consider them or that his sentence is unreasonable.  *See United States v. Haskins*, 511 F.3d 688, 696 (7th Cir. 2007); *Laufle*, 433 F.3d at 988.   The court provided a lengthy, well-considered discussion of its reasons for imposing the sentence it chose and further explained its reasoning in a published order.  We cannot find the sentence to be unreasonable.

AFFIRMED.